**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**CASE NO.:**

FIDELITY BROKERAGE SERVICES LLC,

      Plaintiff,

v.

ERNEST MEADS and
DARWIN WEALTH MANAGEMENT, LLC,

      Defendants.

_____/

## VERIFIED COMPLAINT

Plaintiff Fidelity Brokerage Services LLC ("Fidelity") seeks injunctive relief against the Defendants, its former employee, Ernest Meads ("Meads"), and his new employer, Darwin Wealth Management, LLC ("DWM"), along with an Order compelling arbitration before a Financial Industry Regulatory Authority ("FINRA") Arbitration Panel pursuant to Rules 13200 and 13804 of the FINRA Code of Arbitration Procedure. Meads is presently soliciting Fidelity customers to transfer their business to his new firm, with the aid and encouragement of DWM, and misusing its confidential and trade secret customer information, which he obtained knowledge of and access to as a result of his employment with Fidelity. Meads' and DWM's conduct, among other things, breaches his Employee Agreements with Fidelity and violates Florida and federal law protecting Fidelity's trade secret information.

FP 64912570.1

**PARTIES, JURISDICTION, AND VENUE**

1.      Plaintiff Fidelity Brokerage Services LLC is a Delaware Limited Liability Company, whose sole member is Fidelity Global Brokerage Group, Inc., a corporation organized and existing under the laws of Massachusetts with its principal place of business located in Boston, Massachusetts.  Fidelity is a member firm of FINRA.

2.      Defendant Meads is a former Financial Consultant who worked in Fidelity's Clearwater, Florida Branch.  He is an adult citizen and resident of the state of Florida.  At the time of his employment with Fidelity, Meads was registered with FINRA.

3.      Upon information and belief, Defendant DWM is a Florida Limited Liability Company with an office located at 4601 W. North A Street, Tampa, Florida 33609.

4.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this matter involves a cause of action arising under the Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1831 *et seq*.  *See* 18 U.S.C. § 1836(c) (West 2017) ("The district courts of the United States shall have original jurisdiction of civil actions brought under this section."). This Court has supplemental jurisdiction over the breach of contract and other state law claims herein pursuant to 28 U.S.C. § 1367 because the claims are so related to the DTSA claim for which this Court has original jurisdiction that they form part of the same controversy.  Notably, the Defendants used Fidelity's trade secret customer information to solicit Fidelity customers.

5.       This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the parties are of diverse citizenship and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6.      Venue is proper in this District because Meads worked in this District and most or all of the conduct alleged in this Complaint occurred within this District.

2

**NATURE OF THE CASE**

7.    Through this action, Fidelity seeks injunctive and other relief to stop Meads' continuing violation of his Employee Agreements, and both Defendants' misappropriation and misuse of trade secrets belonging to Fidelity and unfair competition.

8.    Meads has used confidential and trade secret customer information of Fidelity that he had access to by virtue of his employment with Fidelity, to unlawfully solicit those customers to transfer their business to his new firm, DWM, a direct competitor.

9.    Fidelity seeks a preliminary injunction requiring the Defendants to return to Fidelity any and all records and/or documents in any form, received or removed from Fidelity by Meads, containing information pertaining to customers he served or whose names became known to Meads while in the employ of Fidelity, including, but not limited to, any customer list or documents replicated or "recreated" by Meads from memory or otherwise, including by using his memory to look up customer names in public sources.  Fidelity also seeks an order prohibiting further solicitation of customers of Fidelity by Meads or his new employer.  This injunctive relief is necessary to end the Defendants' unlawful activities, which include violation of contracts, misuse of trade secrets and unfair competition.

10.    The parties are obligated to arbitrate the merits of this dispute consistent with the arbitration rules and regulations of FINRA pursuant to FINRA Rule 13200.  Accordingly, Fidelity filed a Statement of Claim with FINRA Dispute Resolution, Inc., seeking binding arbitration of its dispute with Defendants pursuant to Rule 13804(a)(2).

11.    Although the merits of this case will be resolved in arbitration before FINRA, pursuant to FINRA Rule 13804, Fidelity is required to seek and obtain injunctive relief in a court of competent jurisdiction before an expedited FINRA arbitration is permitted to proceed.  Once an

injunction is issued by this Court, an expedited arbitration will be scheduled with FINRA within fifteen (15) days of the entry of the injunction.  If no injunction is issued, however, this case cannot be heard by FINRA on an expedited basis and, instead, will be assigned to a standard-track arbitration, which would likely delay a hearing on the merits for a year or more.  Injunctive relief, therefore, is required to preserve the *status quo* until the merits of this case can be adjudicated by FINRA.

## FACTS COMMON TO ALL COUNTS

### Fidelity's Unique Customer Development Practices

12.     Fidelity and its affiliates provide a variety of financial services—such as retirement services, investment planning, wealth management, securities execution and clearing, life insurance services, and equity services—to Fidelity customers, with whom Fidelity typically enjoys significant, long-term relationships.  Fidelity offers individual investors a broad assortment of trading and cash management features including buying and selling stocks, bonds, options and thousands of mutual funds from Fidelity and other well-known fund companies.

13.     Fidelity is unique in the retail brokerage field because Fidelity does not have its Financial Consultants, such as Meads, make "cold calls" to persons who have no relationship with Fidelity, or who were not referred to Fidelity.

14.     Instead, Fidelity requires its Financial Consultants to develop service relationships based upon leads that Fidelity provides.

15.     Fidelity provides leads to its Financial Consultants from two primary sources.

16.     First, Fidelity forwards information to its representatives from prospective customers who initiate contact with Fidelity either by telephone, over the internet, or in person.

FP 64912570.1

17.    Fidelity and its affiliates devote tens of millions of dollars per year towards attracting customers to Fidelity's various businesses in a variety of means.  Fidelity arranges to publish and broadcast national and local advertisements which invite potential customers to contact Fidelity; Fidelity maintains an interactive internet page that allows interested persons to establish relationships with Fidelity; Fidelity maintains multiple call centers that prospective customers can use to initiate contact with Fidelity; and Fidelity maintains prominent retail locations which prospective customers can visit.

18.    A large portion of Fidelity's business is derived from this initial customer contact that is generated by significant investments of time, labor, and capital by Fidelity.

19.    Second, Fidelity forwards information to its representatives regarding customers, with whom Fidelity already has a relationship.

20.    In addition, representatives may be assigned to service customers previously serviced by other representatives in certain circumstances, such as if the former representative moves, leaves Fidelity, or is promoted to another position.  Moreover, Fidelity clients may be serviced by multiple Fidelity representatives depending upon the clients' needs and service offerings in which they opt to participate at Fidelity.

21.    A significant portion of Fidelity's business is derived from servicing the needs of Fidelity's existing customers.

22.    Fidelity's success in its lead-based approach is based on the typically long-standing relationships it enjoys with its customers.

5

FP 64912570.1

**Fidelity's Trade Secret Customer Information**

23.    Fidelity's success with its unique lead-based approach to supporting Financial Consultants, such as Meads, is also directly tied to Fidelity's trade secret customer information, which is among Fidelity's most important assets.

24.    Fidelity's trade secret customer data includes not only the names and contact information of Fidelity customers, but also includes financial information relating to those customers, such as customer financial statements, investment goals, investment history, assets, income, and net worth.

25.    Although certain portions of such information might be publicly available—such as an individual's name or published home telephone numbers—only a limited number of Fidelity employees know who among the general public are Fidelity customers who have demonstrated a specific need and desire for investment services.

26.    Fidelity developed its customer base through a significant investment of time, labor, and capital, as described above.

27.    Fidelity maintains its customer data in confidence, both to preserve Fidelity's competitive advantage in its customer base and to meet customer expectations that Fidelity will maintain sensitive, personally identifiable information (including their identity as a customer, contact information and financial information) in confidence.

28.    Fidelity derives substantial economic value from preserving its customer data as a trade secret.

29.    Although individual customers are periodically subject to random solicitations from Fidelity competitors, no competitor can effectively target a set of Fidelity customers and address their needs without access to or specific knowledge of Fidelity's trade secret customer

FP 64912570.1

data.  In this way, maintaining the confidentiality of Fidelity's trade secret customer data provides Fidelity with a significant competitive advantage over its competitors.

### Fidelity's Efforts to Preserve the Confidentiality of Its Customer Data

30.    Fidelity vigilantly preserves its trade secret customer data so that it does not become available to competitors who could use the data to divert customers, without the investment of time, labor, and capital that Fidelity made to compile the information.  Fidelity does not provide its trade secret customer data to competitors.

31.    Fidelity maintains its trade secret customer data on password-protected computers, and only employees whose jobs require access to the customer data are provided with such access.

32.    Fidelity maintains and advises its employees of a Global Policy on Information Protection that is displayed on Fidelity's intranet.  A true and correct copy of Fidelity's Corporate Information Protection Policy is attached as Exhibit 1.  Fidelity periodically reminds its employees of this policy and provides employees with a Quick Reference Card ("QRC") explaining how to protect specific types of Fidelity confidential information.  A true and correct copy of Fidelity's QRC is attached as Exhibit 2.

33.    Fidelity also preserves trade secret customer data by requiring employees, including Meads, to sign Employee Agreements in which each employee agrees not to use or disclose Fidelity confidential information, including Fidelity customer information, outside of Fidelity, and not to solicit Fidelity customers.

34.    Fidelity has been vigilant in protecting its customers' privacy because most Fidelity customers do not want, and have not authorized, Fidelity to share their contact or financial information outside of Fidelity.  Furthermore, as discussed more fully below, Fidelity is required by federal law to prevent the disclosure to third parties of nonpublic customer information,

7

FP 64912570.1

including customers' contact information and financial information.  *See* 15 U.S.C. § 6801, *et seq.*; 17 C.F.R. § 248.1, *et seq.*

**Meads Agreed to Protect the Confidentiality of Fidelity's
Trade Secret Customer Information and Not to Solicit Fidelity Customers**

35.     Meads was a Financial Consultant in Fidelity's Clearwater, Florida Branch Office. While working at Fidelity, Meads was assigned clients to service on behalf of Fidelity.

36.     In order for Meads to service the customers' accounts he was assigned to service, Meads required access to the customers' confidential personal and financial information.

37.     Meads specifically acquired access to and knowledge of the names, contact information and confidential financial data for numerous Fidelity clients.  By the time of his departure, he had daily access to and had gained knowledge of confidential Fidelity information relating to hundreds of households and tens of millions of dollars in client assets under Fidelity management.  Moreover, throughout his employment at the Clearwater Branch, the confidential information to which Meads was given access was continually updated as clients were added, new accounts were opened, client assets and investments changed value, clients' financial goals evolved.  As a result Meads was provided with ongoing access to a pool of continually updated and evolving confidential information about the Fidelity clients he was assigned to service.

38.     Fidelity protects its customers' information by requiring each employee who will have access to that information to execute a standard Fidelity Employee Agreement.

39.     Fidelity records indicate that Meads executed the Employee Agreement in connection with his initial employment on October 1, 2020.  A copy of his October 1, 2020 Employee Agreement is attached as Exhibit 3.  Fidelity records indicate that Meads electronically executed Fidelity's Employee Agreement again on May 17, 2021, May 12, 2022, November 23, 2022, and an Employee Agreement and Arbitration Agreement most recently on November 9,

FP 64912570.1

2023 (collectively, "Employee Agreements").  A copy of Meads' May 17, 2021, May 12, 2022, November 23, 2022, November 9, 2023, and Employee Agreements are attached as Exhibits 4, 5, 6, and 7, respectively.

40.    In his Employee Agreements, Meads acknowledged the confidentiality of Fidelity's records, including Fidelity's customer lists and customer information.  *See* Exhibit 7 at ¶ 6. Meads specifically acknowledged that confidential information included information committed to memory.  *Id.*

41.    Meads promised to use Fidelity's trade secrets only in the course of his employment with Fidelity and not to divulge Fidelity's trade secrets to third parties.  *Id.* at ¶ 2.

42.    Meads promised that, upon termination of employment, he would return all Fidelity company property, including but not limited to Confidential Information.[1]  *Id.*

43.    Meads further promised that for a period of one year following termination of his employment he would not directly or indirectly solicit in any manner or induce or attempt to induce any customer or prospective customer with whom he had personal contact or about whom he otherwise learned during the course of his employment with the Fidelity.  *Id.* at ¶ 9.

44.    Meads agreed that any violation of the Employee Agreements—including after his termination—would cause Fidelity irreparable damage and would entitle Fidelity to seek injunctive relief to protect its trade secret customer information, and that in the event of any injunctive proceeding alleging breach, the parties would participate in limited expedited discovery. *Id.* at ¶ 11(a), (d).

45.    As consideration for the Employee Agreements Meads executed, Fidelity hired him, promoted him, provided him with ongoing access to continually updated confidential

---

[1] As such term is defined in the Employee Agreements.

FP 64912570.1

business information, compensated him throughout his employment, and provided him with introductory and continuing on-the-job training. Fidelity assigned Meads customers to service on behalf of Fidelity and provided him with leads to enable him to succeed at Fidelity. Fidelity further provided Meads with support services; paid for facilities, computer equipment, market reporting services, and all other business expenses; and registered Meads with the Financial Industry Regulatory Authority and the New York Stock Exchange. Fidelity provided Meads with sales assistance, research, the benefit of Fidelity advertising, goodwill and name recognition, access to and use of experts in asset management, tax, estate planning and insurance, and with promotional marketing and sales support.

**Meads Misappropriated Fidelity's Trade Secret Customer Information
And Is Using It For The Benefit Of Himself and His New Employer**

46. Despite his contractual obligations and his obligations under Florida law, Meads misappropriated Fidelity's trade secret customer information and has used and continues to use Fidelity's trade secret customer information to solicit Fidelity customers.

47. After Meads' last day of employment with Fidelity on April 5, 2026, Fidelity received reports that Meads was soliciting Fidelity customers to transfer their business to DWM. Specifically, a customer reported that Meads asked him to move his accounts to Meads at his new firm. Another customer also reported that Meads had called him about his new firm and the customer wanted to let us know that Meads "was probably soliciting behind the scenes."

48. Fidelity's counsel sent a letter to Meads reminding him of his contractual obligations, enclosing a copy of one of his Employee Agreements, and demanding that he cease any further solicitation of Fidelity customers and return its confidential and trade secret customer information. Fidelity also enclosed an affidavit for Meads to sign attesting that he did not have, or had returned, any of its customer information. Fidelity also sent a copy of its letter to DWM to

10

FP 64912570.1

ensure that it was aware of Meads' legal obligations. A copy of Fidelity's April 21, 2026 letter to Meads, copying DWM, is attached as Exhibit 8.

49. Defendants' counsel responded to Fidelity's letter, denying that Meads had possession of Fidelity's confidential customer information and denying that he had solicited its customers. As part of his letter, Defendants' counsel provided a signed Affidavit from Meads. A copy of Defendants' counsel's letter to Fidelity's counsel dated April 28, 2026 is attached as Exhibit 9, and a copy of Meads' Affidavit, also dated April 28, 2026, is attached as Exhibit 10.

50. The Affidavit that Meads signed represented that he did not "have in [his] possession, custody or control customer lists… records… or documents pertaining to Fidelity clients or prospective clients [he] worked with or became aware of through [his] employment at Fidelity, including but not limited to names, phone numbers….". Meads affirmed that the information he was denying possession of included "any documents created either during or after [he] left my employment with Fidelity that contain information pertaining to Fidelity clients or prospective clients that [he] worked with or became aware of through [his] employment at Fidelity, including information recreated through the use of memory, or by using information in memory to recreate information from public sources." *See* Ex. 10.

51. Despite attesting under penalty of perjury that he did not have Fidelity's customer information in any form, Fidelity recently received a report indicating that Meads has continued to use Fidelity's trade secret customer information to aggressively solicit customers to transfer their accounts to his new firm. *See* Ex. 10.

52. Specifically, on or about June 29, 2026, a Fidelity customer reported that Meads had contacted her "several" times since his resignation, asking them to move their accounts to him at his new firm.

11

53. Meads could not have contacted Fidelity's customers without having their names and contact information – information which he attested that he did not possess. *See* Ex. 10.

54. Despite Fidelity's attempt to resolve this matter without resort to litigation, and despite his signed Affidavit and his counsel's denial, Meads continues to aggressively solicit Fidelity's customers and has refused to cease his misconduct.

55. Like clients of DWM, there is no public source that lists Fidelity's customers. The only way Meads could have known that these individuals were customers of Fidelity and how to contact them is by exploiting the ongoing access he was given to Fidelity's constantly updated confidential and trade secret information and using his knowledge of that confidential information about Fidelity's clients to identify and target Fidelity clients for his own benefit, and the benefit of DWM.

56. The reports from Fidelity customers confirm that Meads has Fidelity's confidential and trade secret customer information in his possession and is using that information to solicit customers to transfer their business to him at his new firm.

### The Threat of Immediate and Irreparable Harm
### Fidelity Faces from Defendants' Conduct

57. Defendants' conduct has irreparably harmed Fidelity and will continue to irreparably harm Fidelity if not stopped immediately. Indeed, the theft and misuse of Fidelity's trade secret customer information to solicit and unfairly compete with Fidelity causes Fidelity both monetary and irreparable harm. Defendants' conduct has and will continue to irreparably harm Fidelity's relationships with its customers, such as by losing goodwill, losing future business and referrals, as well as losing trust and confidence in securing inherently-private information, which cannot be calculated with precision and cannot be adequately compensated.

12

FP 64912570.1

58.    Fidelity's customer information, including the identity of Fidelity customers, is also required to be kept confidential under the Gramm-Leach-Bliley Act and its implementing regulations.  The statute declares, "[i]t is the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information."  15 U.S.C. § 6801(a) (2012).  The implementing regulation, known as Regulation S-P, prohibits the disclosure of so-called "nonpublic personal information" to third parties without consent.  17 C.F.R. § 248.10 (2017).  Nonpublic personal information is defined to include customer lists from financial institutions, even if those lists contain only names of Fidelity customers because the identity of an individual as being a customer of a particular financial institution is specifically protected by the federal regulations.  17 C.F.R. § 248.3(t)(1) (2017); 17 C.F.R. § 248.3(u)(2)(i)(D) (2017).  Indeed, these regulations also protect a customer's account information.  17 C.F.R. § 248.3(t)(1); 17 C.F.R. § 248.3(u)(1).

59.    Fidelity customers rightfully have an expectation that their confidential contact and financial information, such as their identities, contact information, net worth, risk tolerances, investment goals, and preferences, will be protected and not misused by departing employees.  Thus, customers understandably are concerned when former Fidelity employees, such as Meads, have access to their information and are using it to solicit their business at a new and different securities firm.

60.    In other words, the damage to Fidelity's customer relationships is ongoing and is incalculable, as Fidelity cannot put a price on the value of its customer relationships or the damage caused when Meads took and improperly misused, and continues to misuse, confidential and trade secret customer information on behalf of a competing firm.

13

61.     Fidelity attempted to resolve this issue without resort to litigation, but Defendants have refused to comply with their legal obligations.

62.     Based on all the foregoing facts and conduct, Defendants prepared to engage in, are engaging in, and plan to continue to engage in the following wrongful acts:

- use and/or disclosure of Fidelity's trade secret customer information and misappropriation of the trade secret information contained in confidential Fidelity business records, including specifically the names, addresses, phone numbers, and/or other confidential financial information of Fidelity customers;

- transmission verbally, in writing or in another manner for the use of a Fidelity competitor, customers' contact and other information contained in Fidelity's records; and

- solicitation of Fidelity customers for the benefit of Defendants.

63.     Fidelity has been and continues to be damaged, both monetarily and irreparably, by the actual and threatened loss of customers and customer goodwill caused by Defendants' misappropriation and misuse of Fidelity's trade secret customer information and solicitation of Fidelity's customers in violation of his Employee Agreements and in violation of Florida law.

64.     Denial of injunctive relief would also leave Fidelity vulnerable to the same conduct from other employees.

65.     Fidelity asks for the Court's assistance in protecting its confidential information and stopping Defendants' knowing and intentional wrongful conduct.

## <u>COUNT I</u>
### (Injunctive Relief – Against Both Defendants)

66.     Fidelity hereby realleges and incorporates by reference the allegations of Paragraphs 1 through 65 of the Complaint, inclusive, as though set forth in full.

67.     In doing the acts described herein, Meads and DWM have harmed Fidelity by, among other things, improperly garnering, retaining, disclosing and utilizing Fidelity's confidential and proprietary information and trade secrets, in violation of federal and Florida law,

14

to give Meads and DWM a competitive edge over Fidelity, attempting to poach Fidelity's customer accounts, and diminishing Fidelity's reputation and goodwill.

68. Unless Meads and DWM are preliminarily enjoined from the foregoing conduct, Fidelity will be irreparably harmed by:

(a) Disclosure of trade secrets, customer lists, and other trade secret confidential information that is solely the property of Fidelity and their customers;

(b) Use of Fidelity's trade secrets to solicit customers on behalf of a competitor;

(c) Loss of confidentiality of clients' trade secret records and financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation; and

(d) Potential future economic loss, which is presently incalculable.

69. Thus, Fidelity is entitled to preliminary injunctive relief.

## COUNT II
### (Breach of Contract – Against Meads)

70. Fidelity hereby realleges and incorporates by reference the allegations of Paragraphs 1 through 65 of the Complaint, inclusive, as though set forth in full.

71. Meads' Employee Agreements are valid contracts supported by adequate consideration.

72. In the Employee Agreements, Meads acknowledged that as a consequence of his employment with Fidelity, he would be given access to confidential information about Fidelity's clients. As described above, this information was provided to Meads not only at the outset of his employment, but he was also provided with continuing access to an evolving and nearly continually updated pool of information about the Fidelity clients that he was assigned to service, all of which was essential to his ability to perform his job duties.

73. Pursuant to the terms of his Employee Agreements, Meads agreed to keep Fidelity's records, including particularly Fidelity's customer lists and customer information, confidential.

15

74. Meads promised to use Fidelity's customer information only in the course of his employment with Fidelity and promised not to divulge Fidelity's customer information to third parties.

75. Meads violated the confidentiality and non-disclosure provisions of his Employee Agreements by using confidential customer information on behalf of himself, including by using that information to solicit customers of Fidelity to follow him to his new firm.

76. Meads also promised to return any of Fidelity's customer information in his possession to Fidelity upon termination of his employment.

77. Meads sought to circumvent and in fact breached this provision of his Employee Agreements by, on information and belief, either taking the Confidential Information, or creating or recreating the Confidential Information from memory for competitive use at his new firm.

78. Meads also promised that he would not solicit customers of Fidelity for a period of one year after his termination.

79. Meads breached the non-solicitation provision of his Employee Agreements by using his knowledge of Fidelity's customer information to solicit customers to transfer their business to him at his new firm.

80. Meads continues to violate his contractual obligations and will continue to violate these obligations in the future unless enjoined.

81. As a consequence of the foregoing, Fidelity has suffered and will continue to suffer irreparable harm for which it lacks an adequate remedy at law, as well as present economic loss and other incalculable financial loss.

FP 64912570.1

82.     In his Employee Agreements, Meads expressly agreed that "any breach of the Agreement would cause Fidelity to suffer immediate and irreparable harm" to Fidelity.  Ex. 7 at ¶ 11.

83.     Unless Meads is enjoined from the foregoing conduct, Fidelity will be irreparably harmed by:

> (a)     Disclosure of trade secrets, customer lists, and other trade secret confidential information that is solely the property of Fidelity and its customers;
>
> (b)     Use of Fidelity's trade secrets to solicit customers on behalf of a competitor;
>
> (c)     Loss of confidentiality of clients' trade secret records and financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation; and
>
> (d)     Potential future economic loss, which is presently incalculable.

## COUNT III
### (Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act – 18 U.S.C. § 1836 *et seq*. – Against Both Defendants)

84.     Fidelity hereby realleges and incorporates by reference the allegations of Paragraphs 1 through 65 of the Complaint, inclusive, as though set forth in full.

85.     The above-alleged facts constitute actual and threatened misappropriation of trade secrets by Meads and DWM pursuant to the DTSA, 18 U.S.C. § 1836 *et seq.*

86.     Fidelity's above-described trade secrets, including the contact and confidential financial and account information of Fidelity's customers, are subject to reasonable efforts by Fidelity to maintain their secrecy and/or confidentiality.  Fidelity's customer information is not generally known.

87.     Defendants have misappropriated and misused Fidelity's customer information without Fidelity's consent.  The Defendants engaged in this conduct despite acquiring this information under circumstances giving rise to a duty to maintain the information's secrecy and

limit its use, which duty Meads owed and continues to owe Fidelity as a former agent, employee and representative of Fidelity.

88.     Fidelity's trade secret information is related to products and services that are used in, and intended for use in, interstate commerce. 18 U.S.C. § 1836(b)(1).

89.     Such information is also protected as "non-public" information under federal securities Regulation S-P.  17 C.F.R. § 248.3(t)(1); 17 C.F.R. § 248.3(u).  Accordingly, Fidelity is required by federal statute to ensure that non-public customer contact, financial, and account information such as that misappropriated by Defendants is not disclosed to third parties without consent.  17 C.F.R. § 248.10.

90.     Fidelity derives a significant economic benefit from the above-described trade secrets.

91.     Fidelity faces an immediate threat of continuing irreparable harm, for which Fidelity lacks an adequate remedy at law, from Defendants' ongoing misappropriation and misuse of Fidelity's trade secret customer information.

92.     Unless Meads and DWM are preliminarily enjoined from the foregoing conduct, Fidelity will be irreparably harmed by:

>       (a)     Disclosure of trade secrets, customer lists, and other trade secret confidential information that is solely the property of Fidelity and its customers;
>
>       (b)     Use of Fidelity's trade secrets to solicit customers on behalf of a competitor;
>
>       (c)     Loss of confidentiality of clients' trade secret records and financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation; and
>
>       (d)     Potential future economic loss, which is presently incalculable.

93.     Defendants' conduct constitutes a willful and malicious misappropriation of Fidelity's trade secrets.

### COUNT IV
**(Misappropriation of Trade Secrets Under Florida Law Florida Uniform Trade Secrets Act, § 688.01, Fla. Stat. *et seq.* – Against Both Defendants)**

94.    Fidelity hereby realleges and incorporates by reference the allegations of Paragraphs 1 through 65 of the Complaint, inclusive, as though set forth in full.

95.    The books, files and records of Fidelity, the confidential information contained therein, and especially the data pertaining to Fidelity clients, including clients' names and addresses, as well as additional information such as clients' social security numbers, account numbers, financial status, financial statements, investment objectives and preferences, assets and/or securities held by these customers, and other highly confidential personal and financial information concerning Fidelity's clients, are trade secrets of Fidelity subject to protection under the Florida Uniform Trade Secrets Act, § 688.01, Fla. Stat. *et seq.*

96.    This information derives independent economic value by not being accessible, through proper means, to competitors such as Meads and DWM who can profit from its use or disclosure.  The identities of Fidelity's clients are not readily available to the public or to Fidelity's competitors.  Fidelity has spent significant sums, in terms of both financial and human resources, to develop and maintain this information, which is of great value to any competitor.

97.    Fidelity has taken more than adequate measures under the circumstances to maintain the secrecy of this information, including assigning computer access passwords to be used to access Fidelity computer systems and records, restricting access to its business premises, and having employees, including Meads, sign agreements which expressly prohibit the use and disclosure of such information outside of Fidelity.

98.    The foregoing conduct of Meads and DWM constitutes an actual and threatened misappropriation and misuse of Fidelity's trade secret information in violation of the Florida Uniform Trade Secrets Act, § 688.01, Fla. Stat. *et seq.*

FP 64912570.1

99. Upon information and belief, Meads has acquired and used customer information of Fidelity without customers' consent. Meads engaged in this conduct despite acquiring this information under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty Meads owed and continues to owe Fidelity as a former agent, employee and representative of Fidelity.

100. Because Defendants' unlawful conduct is ongoing, Fidelity faces an immediate threat of continuing irreparable harm, for which Fidelity lacks an adequate remedy at law.

## COUNT V
**(Violation of Florida Deceptive and Unfair Trade Practices Act, § 501.204, Florida Statutes Unfair Competition – Against Both Defendants)**

101. Fidelity hereby realleges and incorporates by reference the allegations of Paragraphs 1 through 65 of the Complaint, inclusive, as though set forth in full.

102. Defendants' conduct constitutes an unfair method of competition under Florida law. DWM actively participated in all of the acts of unfair competition outlined above.

103. DWM wrongfully interfered with Fidelity's relationship and contract with its former employee, Meads.

104. Both Defendants wrongfully took and misused Fidelity's proprietary information, and otherwise unfairly competed in order to gain a competitive advantage in the marketplace for financial services.

105. Defendants' conduct interfered with Fidelity's ability to conduct its business and continue its relationships with its clients.

106. Defendants' acts of unfair competition were willful and intentional.

107. As a direct and proximate result of the acts and course of conduct of the Defendants described above, Fidelity has suffered and will continue to suffer irreparable harm and loss.

FP 64912570.1

108.    Unless this Court enjoins them from doing so, the Defendants will continue their unlawful acts of unfair competition, causing Fidelity immediate, irreparable damage for which it has no adequate remedy at law.

109.    Therefore, Fidelity is entitled to preliminary injunctive relief enjoining Meads and DWM from any further acts of unfair competition.

## COUNT VI
### (Tortious Interference with Existing Business Relations – Against Both Defendants)

110.    Fidelity hereby realleges and incorporates by reference the allegations of Paragraphs 1 through 65 of the Complaint, inclusive, as though set forth in full.

111.    Fidelity had existing contractual and other business relationships with its clients. Meads and DWM tortiously interfered with Fidelity's client relationships by, upon information and belief, planning to and in fact soliciting clients to move their business to Meads at DWM, including through the use of Fidelity's confidential information.

112.    As a direct and proximate result of the Defendants' conduct, Fidelity has suffered and will continue to suffer financial loss, loss of goodwill, an irreparable loss of the confidentiality of client information, as well as the loss of proprietary firm information and trade secrets.

113.    Fidelity is entitled to a preliminary injunction enjoining the Defendants from further acts of tortious interference.

## COUNT VII
### (Unjust Enrichment – Against Both Defendants)

114.    Fidelity hereby realleges and incorporates by reference the allegations of Paragraphs 1 through 65 of the Complaint, inclusive, as though set forth in full.

21

FP 64912570.1

115.    Meads and DWM have misappropriated trade secrets and confidential information of Fidelity, Meads has breached his Employee Agreements, and both Defendants have unfairly competed with Fidelity, thereby wrongfully benefitting from their actions.

116.    As a result of Defendants' wrongful and illegal conduct, they have benefitted in the form of Fidelity business that has transferred to Meads at DWM.  Also, as a result of the Defendants' wrongful and illegal conduct, Fidelity has suffered harm.

117.    Allowing the Defendants to benefit from such conduct would be unfair and should be prohibited.

## PRAYER FOR RELIEF

For the reasons set forth above, Fidelity respectfully requests that the Court:

(A)    Enter a preliminary injunction, pending arbitration with Defendants before FINRA or until further order of the Court:

1.    Enjoining Meads and anyone acting in concert with him, including any agent, officer, employee, or representative of his new employer, DWM, effective immediately, from using, disclosing, transmitting or continuing to possess for any purpose, the information contained in the records of Fidelity regarding those customers whom Meads served or who became known to him while in the employ of Fidelity, including, but not limited to, the names, addresses, and confidential financial information of those customers (excluding information provided to Defendants directly by Fidelity customers after Meads' resignation);

2.    Ordering the Defendants, and anyone acting in concert with them, to return to Fidelity any and all records, information and/or documents in any form, containing information pertaining to customers or prospective customers of Fidelity whom Meads served or whose name became known to him while in the employ of Fidelity, within five (5) days from the entry of this Court's Order, including any and all copies.  This requirement includes all records, information or documents, in any form, created by Meads based on documents or information that was received or removed from Fidelity by him, and specifically includes any customer information of Fidelity that may have been created or recreated by him from memory or by using memory to look up customer names and contact information in public sources, or derived from information created or recreated by Meads from memory.  This provision excludes any documents or information provided

22

to Meads by customers after his termination of employment with Fidelity. Notwithstanding the foregoing, if any records, documents or information to be returned and purged pursuant to this paragraph exist in electronic form (hereinafter "Electronically Stored Information" or "ESI"), such ESI shall immediately be preserved in a forensically sound manner prior to any purge or return, and the Defendants or their counsel shall coordinate with Plaintiff's counsel to arrange for return and purging of such ESI within five (5) days;

3. Enjoining the Defendants from soliciting or inducing, whether directly or indirectly, and whether alone or in concert with others, any business from any of Fidelity's customers whom Meads served or whose name became known to Meads while in the employ of Fidelity, including, without limitation, all customers he learned of through his employment with Fidelity; and

4. Directing that the parties, pursuant to the Federal Arbitration Act, 9 U.S.C. §§3–4, shall proceed toward an expedited arbitration hearing on the merits before a duly appointed panel of arbitrators pursuant to Rule 13804 of the FINRA Code of Arbitration Procedure.

(B) Enter such other and further relief as this Court may deem equitable and just.

Date: July 10, 2026                              Respectfully submitted,

                                                 FISHER & PHILLIPS LLP

                                                  /s/ Andrew Froman
                                                 _____
                                                 Andrew Froman, Esq.
                                                 Fla. Bar No. 0019429
                                                 401 E. Jackson Street
                                                 Suite 3100
                                                 Tampa, Florida 32602
                                                 Telephone: (813) 769-7505
                                                 Facsimile: (813) 769-7501
                                                 afroman@fisherphillips.com

                                                 *Attorneys for Plaintiff*

FP 64912570.1

## **VERIFICATION**

I, Craig Brolin, Vice President, Branch Manager of Fidelity Brokerage Services LLC's ("Fidelity") Clearwater Branch, am the authorized representative of Fidelity for the purposes of verifying the foregoing Complaint.  Under penalty of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

*Craig M. Brolin*
Craig M. Brolin (Jul 9, 2026 13:57:57 EDT)

Craig Brolin

Executed on Jul 9, 2026

1

FP 64912633.1

# EXHIBIT A

DocuSign Envelope ID: D6462810-5EAC-4BF1-85F0-218BAE535C85

# Employee Agreement

Ernie Meads

("Employee") wishes to be employed by FMR LLC and/or any entity that is directly or indirectly, wholly or in part, owned or controlled by or under common control with FMR LLC (the "Fidelity Companies"). As a condition of employment, Employee and the Fidelity Companies agree to abide by this Agreement. This Agreement describes certain aspects of Employee's employment, protects Confidential Information and goodwill of the Fidelity Companies, and assists the Fidelity Companies in complying with their legal, regulatory, and other obligations.

1. **Confidential Information.** To assist Employee in the performance of his/her duties, the Fidelity Companies agree to provide to Employee training and/or education regarding the Fidelity Companies' business methods, and agree to provide to Employee access to certain Confidential Information belonging to the Fidelity Companies. Confidential Information consists of all information pertaining to the business of any of the Fidelity Companies that is not generally known to the public at the time made known to Employee. It includes but is not limited to trade secrets; secret, confidential, and proprietary information; information protected by the attorney-client privilege; marketing, financial, research, trading, portfolio, and sales information; computer passwords and program designs; proprietary computer software designs and hardware configurations; proprietary technology; new product and service ideas; business, pricing, and marketing plans; customer, prospect, vendor, and personnel lists; financial and other personal information regarding customers and employees; confidential information about other companies and their products; and information expressly designated as "Fidelity Highly Confidential," "Fidelity Confidential," or "Fidelity Internal." All Confidential Information is imparted to Employee in a relationship of confidence. As a condition and in consideration of the Fidelity Companies' agreement to provide Employee with training and/or education and Confidential Information, Employee agrees that during his/her employment and thereafter, Employee will not copy, reproduce, use, disclose, or discuss in any manner, in whole or in part, any Confidential Information unless (1) necessary for Employee to carry out his/her job; (2) necessary for employees or other agents of the Fidelity Companies to carry out their duties and responsibilities; or (3) authorized in writing by the Fidelity Companies. Employee also will not retain any copies, notes, or excerpts of Confidential Information upon termination of his/her employment. Employee will promptly notify the Fidelity Companies of any inadvertent, unauthorized, or negligent copying, reproduction, use, disclosure, or discussion of Confidential Information. Employee will not open, read, or in any way access Confidential Information without authorization. The foregoing requirements are subject to the limitations set forth in paragraph 10, below.

2. **Systems Access.** In order to carry out his/her responsibilities, Employee may be given access to various computer systems and passwords, user identifications, or other authenticating information ("password(s)"). Employee will not disclose his/her password(s) to anyone except in accordance with Fidelity policy. While incidental personal use of systems may occur, this is not the purpose of providing access; rather, all systems generally are to be used for legitimate Fidelity business purposes only, and all items created, accessed, or stored will be treated as Fidelity property for all purposes, including but not limited to monitoring, access, recording, review, and disclosure by Fidelity. Employee will adhere to all software licensing or other agreements applicable to systems and to Fidelity's expectations and policies regarding systems usage. Employee's authorization to access Fidelity systems shall expire when Employee leaves Fidelity's employ.



3. **Company Property.** Upon termination of Employee's employment, in the event Employee's employment no longer requires access to Confidential Information, or at any earlier time as requested by the Fidelity Companies, Employee will return all company property, including but not limited to his/her identification badge, company credit cards, company-owned equipment (such as cellular telephones, beepers, and laptop computers), and all documents and materials received from or created for or by any of the Fidelity Companies, including but not limited to Confidential Information.

4. **Outside Business Activities.** So long as Employee is employed by the Fidelity Companies, Employee will not engage in any other employment or business activities unless Employee receives prior written approval from the Fidelity Companies in accordance with applicable policies and procedures. Approval for outside activities may be withdrawn at any time.

5. **Ethics and Outside Brokerage Accounts.** So long as Employee is employed by the Fidelity Companies, Employee will adhere to the Code of Ethics for Personal Investing and the Statement of Policies and Procedures on Insider Trading and all other policies, procedures, or guidelines regarding Fidelity's standards for the proper conduct of business. If Employee is an employee of or associated with a registered broker-dealer or registered with the New York Stock Exchange or the Financial Industry Regulatory Authority, Employee will comply with industry agreements, standards, and regulations, and all special policies, compliance standards, and guidelines of the Fidelity Companies applicable to those in regulated businesses. Neither Employee nor Employee's spouse will maintain any brokerage account that either Employee or Employee's spouse owns or in which either Employee or Employee's spouse has a beneficial interest through any non-Fidelity broker-dealer unless Employee receives prior written approval from the Fidelity Companies in accordance with applicable policies and procedures. Approval for an outside account may be withdrawn at any time.

6. **Non-solicitation.** In consideration of the training and/or education and access to Confidential Information provided by the Fidelity Companies, and so as to enforce Employee's agreement regarding such Confidential Information, Employee agrees that during his/her employment and for a period of one year following his/her separation from employment by the Fidelity Companies, Employee will not use any Confidential Information belonging to the Fidelity Companies to directly or indirectly, on his/her own behalf or on behalf of anyone else or any company, solicit in any manner or induce or attempt to induce any customer or prospective customer of the Fidelity Companies to divert or take away all or any portion of his/her/its business from the Fidelity Companies or otherwise cease the relationship with the Fidelity Companies. During this same period, Employee will not directly or indirectly, on his/her own behalf or on behalf of anyone else or any company, solicit in any manner or induce or attempt to induce any customer or prospective customer with whom Employee had personal contact or about whom Employee otherwise learned during the course of Employee's employment with the Fidelity Companies. Employee also will not, directly or indirectly, on his/her own behalf or on behalf of anyone or any company, hire, solicit in any manner, or induce or attempt to induce any employee of any of the Fidelity Companies to leave his/her employment.



7. **Inventions and Use of Name or Likeness.** Employee will disclose and Employee hereby assigns to Fidelity as Fidelity's exclusive property all ideas, writings, inventions, products, methods, techniques, discoveries, improvements, and technical or business innovations (the "Inventions") that Employee makes or conceives, whether or not patentable or copyrightable, either solely or jointly with others, during the period of his/her employment. All written or computer coded materials manifested in documents, systems design, disks, tapes, drawings, reports, specifications, data, memoranda, or otherwise (the "Materials") made or conceived during Employee's employment shall be considered works made for hire, and all right, title, and interest in the Materials shall be owned by the Fidelity Companies. To the extent that the Materials may be held not to be works made for hire, Employee hereby assigns the sole right, title, and interest in the Materials to the Fidelity Companies. In addition, Employee will execute all necessary paperwork and provide all other reasonable assistance requested by any of the Fidelity Companies, either during his/her employment or thereafter, to enable the Fidelity Companies to obtain, maintain, or enforce in itself or its nominees, patents, copyrights, trademarks, or other legal protection on the Inventions in any and all countries. These provisions with respect to Inventions and Materials apply only to Inventions and Materials which (i) are along the lines of the business or work of any of the Fidelity Companies; (ii) result from or are suggested by any work which Employee does for the Fidelity Companies; (iii) are made or conceived using equipment or other materials of the Fidelity Companies; or (iv) are made or conceived during regular hours of work. These provisions do not apply to any invention that qualifies fully under the terms of California Labor Code Section 2870. In addition, Employee hereby authorizes the Fidelity Companies to use, publish, and copyright all or part of his/her name, voice, picture, portrait, and likeness as the Fidelity Companies may decide in their sole discretion, in all media and types of advertising for any product or service or for any other lawful purpose, without review by Employee.

8. **Agreements with Others.** Employee represents and warrants that his/her employment by the Fidelity Companies will not require Employee to violate any agreement Employee may have with any employer or other business, and that Employee will not engage in any activities in violation of any such agreement. Without limiting the foregoing, Employee will not use or disclose to the Fidelity Companies any confidential information belonging to others. Employee further represents and warrants that Employee is not a party to any agreement, and Employee owes no duty to anyone, that limits or affects his/her ability to perform his/her duties for the Fidelity Companies. Employee has attached to this Agreement a list of all confidentiality, inventions, non-solicitation, non-compete, or other restrictive agreements to which Employee is or has been a party.

9. **At Will Employment.** Employee's employment by the Fidelity Companies is at will and may be terminated by Employee or by the Fidelity Companies at any time and for any reason, with or without cause or notice, during or after any applicable initial evaluation period.



10. **Communication with Government Entities.** Nothing in this Agreement shall prohibit or restrict you from (A) communicating directly with, cooperating with, providing or causing to be provided information to, or otherwise assisting in an investigation by the Securities and Exchange Commission, FINRA, the Equal Employment Opportunity Commission, the Department of Justice, or any other government or regulatory agency, entity, or official or self-regulatory organization (collectively, "Government Authority") regarding a possible violation of any law, rule, or regulation; or (B) responding to any inquiry or legal process directed to you individually (and not directed to the Company and/or its subsidiaries) from any such Government Authority, including an inquiry about the existence of this Agreement or its underlying facts or circumstances. Nor does this Agreement require you to obtain prior authorization from the Company before engaging in any conduct described in this paragraph, or to notify the Company that you have engaged in any such conduct. However, in connection with any such activity, you acknowledge that you will take reasonable precautions to ensure that confidential information disclosed to any Government Authority is not made generally available to the public, including by informing the recipient of the confidential nature of the same.

11. **Miscellaneous.** This agreement will continue in full force and effect throughout Employee's tenure with any of the Fidelity Companies, regardless of any changes in Employee's responsibilities, the position Employee holds, or the particular Fidelity Company that employs Employee. Any agreement contrary to any of the provisions of this agreement or modifying this agreement in any way must be in writing and must be signed by the President or Human Resources Vice President of the Fidelity Company for which Employee works. Employee will disclose the existence and terms of this Agreement to any future employer of Employee. Employee's obligations under this Agreement shall survive the termination of Employee's employment with the Fidelity Companies. As to the provisions pertaining to Confidential Information, Employee's obligations shall continue until such time as the Confidential Information becomes known to the general public through no action on Employee's part. Any violation of this Agreement will cause irreparable damage to the Fidelity Companies or any of them. Therefore, the Fidelity Companies or any of them shall have the right to seek specific enforcement of this Agreement through equitable and injunctive relief, in addition to any other remedies available. This agreement will be for the benefit of the Fidelity Companies, its successors, and its assigns. The terms of this Agreement and any dispute out of it shall be governed by, and construed in accordance with, the laws of the state in which Employee currently is or, once Employee is no longer employed, was last, employed by Fidelity, without giving effect to such state's conflict of law principles. This Agreement is signed under seal.

**This agreement contains important information regarding the terms of Employee's employment with the Fidelity Companies. Employee and the Fidelity Companies hereby agree to adhere to it.**

DocuSigned by:

*Ernie Meads*

664804D4143E49F...

10/1/2020

**Candidate eSignature**

**eSign Date**

*Paul H Lesser*

Paul H Lesser

Head of Talent Acquisition

Updated 04/2018 Fidelity Highly Confidential Information

# EXHIBIT B

DocuSign Envelope ID: 3D4B86FB-0611-4522-B7ED-6FBC32D46B15

# Employee Agreement

Ernie Meads

("Employee") wishes to be employed by FMR LLC and/or any entity that is directly or indirectly, wholly or in part, owned or controlled by or under common control with FMR LLC (the "Fidelity Companies"). As a condition of employment, Employee and the Fidelity Companies agree to abide by this Agreement. This Agreement describes certain aspects of Employee's employment, protects Confidential Information and goodwill of the Fidelity Companies, and assists the Fidelity Companies in complying with their legal, regulatory, and other obligations.

1. **Confidential Information.** To assist Employee in the performance of his/her duties, the Fidelity Companies agree to provide to Employee training and/or education regarding the Fidelity Companies' business methods, and agree to provide to Employee access to certain Confidential Information belonging to the Fidelity Companies. Confidential Information consists of all information pertaining to the business of any of the Fidelity Companies that is not generally known to the public at the time made known to Employee. It includes but is not limited to trade secrets; secret, confidential, and proprietary information; information protected by the attorney-client privilege; marketing, financial, research, trading, portfolio, and sales information; computer passwords and program designs; proprietary computer software designs and hardware configurations; proprietary technology; new product and service ideas; business, pricing, and marketing plans; customer, prospect, vendor, and personnel lists; financial and other personal information regarding customers and employees; confidential information about other companies and their products; and information expressly designated as "Fidelity Highly Confidential," "Fidelity Confidential," or "Fidelity Internal." All Confidential Information is imparted to Employee in a relationship of confidence. As a condition and in consideration of the Fidelity Companies' agreement to provide Employee with training and/or education and Confidential Information, Employee agrees that during his/her employment and thereafter, Employee will not copy, reproduce, use, disclose, or discuss in any manner, in whole or in part, any Confidential Information unless (1) necessary for Employee to carry out his/her job; (2) necessary for employees or other agents of the Fidelity Companies to carry out their duties and responsibilities; or (3) authorized in writing by the Fidelity Companies. Employee also will not retain any copies, notes, or excerpts of Confidential Information upon termination of his/her employment. Employee will promptly notify the Fidelity Companies of any inadvertent, unauthorized, or negligent copying, reproduction, use, disclosure, or discussion of Confidential Information. Employee will not open, read, or in any way access Confidential Information without authorization. The foregoing requirements are subject to the limitations set forth in paragraph 10, below.

2. **Systems Access.** In order to carry out his/her responsibilities, Employee may be given access to various computer systems and passwords, user identifications, or other authenticating information ("password(s)"). Employee will not disclose his/her password(s) to anyone except in accordance with Fidelity policy. While incidental personal use of systems may occur, this is not the purpose of providing access; rather, all systems generally are to be used for legitimate Fidelity business purposes only, and all items created, accessed, or stored will be treated as Fidelity property for all purposes, including but not limited to monitoring, access, recording, review, and disclosure by Fidelity. Employee will adhere to all software licensing or other agreements applicable to systems and to Fidelity's expectations and policies regarding systems usage. Employee's authorization to access Fidelity systems shall expire when Employee leaves Fidelity's employ.



3. **Company Property.** Upon termination of Employee's employment, in the event Employee's employment no longer requires access to Confidential Information, or at any earlier time as requested by the Fidelity Companies, Employee will return all company property, including but not limited to his/her identification badge, company credit cards, company-owned equipment (such as cellular telephones, beepers, and laptop computers), and all documents and materials received from or created for or by any of the Fidelity Companies, including but not limited to Confidential Information.

4. **Outside Business Activities.** So long as Employee is employed by the Fidelity Companies, Employee will not engage in any other employment or business activities unless Employee receives prior written approval from the Fidelity Companies in accordance with applicable policies and procedures. Approval for outside activities may be withdrawn at any time.

5. **Ethics and Outside Brokerage Accounts.** So long as Employee is employed by the Fidelity Companies, Employee will adhere to the Code of Ethics for Personal Investing and the Statement of Policies and Procedures on Insider Trading and all other policies, procedures, or guidelines regarding Fidelity's standards for the proper conduct of business. If Employee is an employee of or associated with a registered broker-dealer or registered with the New York Stock Exchange or the Financial Industry Regulatory Authority, Employee will comply with industry agreements, standards, and regulations, and all special policies, compliance standards, and guidelines of the Fidelity Companies applicable to those in regulated businesses. Neither Employee nor Employee's spouse will maintain any brokerage account that either Employee or Employee's spouse owns or in which either Employee or Employee's spouse has a beneficial interest through any non-Fidelity broker-dealer unless Employee receives prior written approval from the Fidelity Companies in accordance with applicable policies and procedures. Approval for an outside account may be withdrawn at any time.

6. **Non-solicitation.** In consideration of the training and/or education and access to Confidential Information provided by the Fidelity Companies, and so as to enforce Employee's agreement regarding such Confidential Information, Employee agrees that during his/her employment and for a period of one year following his/her separation from employment by the Fidelity Companies, Employee will not use any Confidential Information belonging to the Fidelity Companies to directly or indirectly, on his/her own behalf or on behalf of anyone else or any company, solicit in any manner or induce or attempt to induce any customer or prospective customer of the Fidelity Companies to divert or take away all or any portion of his/her/its business from the Fidelity Companies or otherwise cease the relationship with the Fidelity Companies. During this same period, Employee will not directly or indirectly, on his/her own behalf or on behalf of anyone else or any company, solicit in any manner or induce or attempt to induce any customer or prospective customer with whom Employee had personal contact or about whom Employee otherwise learned during the course of Employee's employment with the Fidelity Companies. Employee also will not, directly or indirectly, on his/her own behalf or on behalf of anyone or any company, hire, solicit in any manner, or induce or attempt to induce any employee of any of the Fidelity Companies to leave his/her employment.



7. **Inventions and Use of Name or Likeness.** Employee will disclose and Employee hereby assigns to Fidelity as Fidelity's exclusive property all ideas, writings, inventions, products, methods, techniques, discoveries, improvements, and technical or business innovations (the "Inventions") that Employee makes or conceives, whether or not patentable or copyrightable, either solely or jointly with others, during the period of his/her employment. All written or computer coded materials manifested in documents, systems design, disks, tapes, drawings, reports, specifications, data, memoranda, or otherwise (the "Materials") made or conceived during Employee's employment shall be considered works made for hire, and all right, title, and interest in the Materials shall be owned by the Fidelity Companies. To the extent that the Materials may be held not to be works made for hire, Employee hereby assigns the sole right, title, and interest in the Materials to the Fidelity Companies. In addition, Employee will execute all necessary paperwork and provide all other reasonable assistance requested by any of the Fidelity Companies, either during his/her employment or thereafter, to enable the Fidelity Companies to obtain, maintain, or enforce in itself or its nominees, patents, copyrights, trademarks, or other legal protection on the Inventions in any and all countries. These provisions with respect to Inventions and Materials apply only to Inventions and Materials which (i) are along the lines of the business or work of any of the Fidelity Companies; (ii) result from or are suggested by any work which Employee does for the Fidelity Companies; (iii) are made or conceived using equipment or other materials of the Fidelity Companies; or (iv) are made or conceived during regular hours of work. These provisions do not apply to any invention that qualifies fully under the terms of California Labor Code Section 2870. In addition, Employee hereby authorizes the Fidelity Companies to use, publish, and copyright all or part of his/her name, voice, picture, portrait, and likeness as the Fidelity Companies may decide in their sole discretion, in all media and types of advertising for any product or service or for any other lawful purpose, without review by Employee.

8. **Agreements with Others.** Employee represents and warrants that his/her employment by the Fidelity Companies will not require Employee to violate any agreement Employee may have with any employer or other business, and that Employee will not engage in any activities in violation of any such agreement. Without limiting the foregoing, Employee will not use or disclose to the Fidelity Companies any confidential information belonging to others. Employee further represents and warrants that Employee is not a party to any agreement, and Employee owes no duty to anyone, that limits or affects his/her ability to perform his/her duties for the Fidelity Companies. Employee agrees to disclose to the Fidelity Companies, and provide copies to the Fidelity Companies if copies are available, all confidentiality, inventions, non-solicitation, non-compete, or other restrictive agreements to which Employee is or has been a party.

9. **At Will Employment.** Employee's employment by the Fidelity Companies is at will and may be terminated by Employee or by the Fidelity Companies at any time and for any reason, with or without cause or notice, during or after any applicable initial evaluation period.



10. **Communication with Government Entities.** Nothing in this Agreement shall prohibit or restrict you from (A) communicating directly with, cooperating with, providing or causing to be provided information to, or otherwise assisting in an investigation by the Securities and Exchange Commission, FINRA, the Equal Employment Opportunity Commission, the Department of Justice, or any other government or regulatory agency, entity, or official or self-regulatory organization (collectively, "Government Authority") regarding a possible violation of any law, rule, or regulation; or (B) responding to any inquiry or legal process directed to you individually (and not directed to the Company and/or its subsidiaries) from any such Government Authority, including an inquiry about the existence of this Agreement or its underlying facts or circumstances. Nor does this Agreement require you to obtain prior authorization from the Company before engaging in any conduct described in this paragraph, or to notify the Company that you have engaged in any such conduct. However, in connection with any such activity, you acknowledge that you will take reasonable precautions to ensure that confidential information disclosed to any Government Authority is not made generally available to the public, including by informing the recipient of the confidential nature of the same.

11. **Miscellaneous.** This agreement will continue in full force and effect throughout Employee's tenure with any of the Fidelity Companies, regardless of any changes in Employee's responsibilities, the position Employee holds, or the particular Fidelity Company that employs Employee. Any agreement contrary to any of the provisions of this agreement or modifying this agreement in any way must be in writing and must be signed by the President or Human Resources Vice President of the Fidelity Company for which Employee works. Employee will disclose the existence and terms of this Agreement to any future employer of Employee. Employee's obligations under this Agreement shall survive the termination of Employee's employment with the Fidelity Companies. As to the provisions pertaining to Confidential Information, Employee's obligations shall continue until such time as the Confidential Information becomes known to the general public through no action on Employee's part. Any violation of this Agreement will cause irreparable damage to the Fidelity Companies or any of them. Therefore, the Fidelity Companies or any of them shall have the right to seek specific enforcement of this Agreement through equitable and injunctive relief, in addition to any other remedies available. This agreement will be for the benefit of the Fidelity Companies, its successors, and its assigns. The terms of this Agreement and any dispute out of it shall be governed by, and construed in accordance with, the laws of the state in which Employee currently is or, once Employee is no longer employed, was last, employed by Fidelity, without giving effect to such state's conflict of law principles. This Agreement is signed under seal.

**This agreement contains important information regarding the terms of Employee's employment with the Fidelity Companies. Employee and the Fidelity Companies hereby agree to adhere to it.**

DocuSigned by:

*Ernie Meads*

56228590F5F349B...

5/17/2021

**Candidate eSignature**                                                    **eSign Date**

*Paul H Lesser*

Paul H Lesser

Head of Talent Acquisition

Updated 04/2018 Fidelity Highly Confidential Information

# EXHIBIT C

# Employee Agreement

**Ernie Meads**

("Employee") wishes to be employed by FMR LLC and/or any entity that is directly or indirectly, wholly or in part, owned or controlled by or under common control with FMR LLC (the "Fidelity Companies"). As a condition of employment, Employee and the Fidelity Companies agree to abide by this Agreement. This Agreement describes certain aspects of Employee's employment, protects Confidential Information and goodwill of the Fidelity Companies, and assists the Fidelity Companies in complying with their legal, regulatory, and other obligations.

1. **Confidential Information.** To assist Employee in the performance of his/her duties, the Fidelity Companies agree to provide to Employee training and/or education regarding the Fidelity Companies' business methods, and agree to provide to Employee access to certain Confidential Information belonging to the Fidelity Companies. Confidential Information consists of all information pertaining to the business of any of the Fidelity Companies that is not generally known to the public at the time made known to Employee. It includes but is not limited to trade secrets; secret, confidential, and proprietary information; information protected by the attorney-client privilege; marketing, financial, research, trading, portfolio, and sales information; computer passwords and program designs; proprietary computer software designs and hardware configurations; proprietary technology; new product and service ideas; business, pricing, and marketing plans; customer, prospect, vendor, and personnel lists; financial and other personal information regarding customers and employees; confidential information about other companies and their products; and information expressly designated as "Fidelity Highly Confidential," "Fidelity Confidential," or "Fidelity Internal." All Confidential Information is imparted to Employee in a relationship of confidence. As a condition and in consideration of the Fidelity Companies' agreement to provide Employee with training and/or education and Confidential Information, Employee agrees that during his/her employment and thereafter, Employee will not copy, reproduce, use, disclose, or discuss in any manner, in whole or in part, any Confidential Information unless (1) necessary for Employee to carry out his/her job; (2) necessary for employees or other agents of the Fidelity Companies to carry out their duties and responsibilities; or (3) authorized in writing by the Fidelity Companies. Employee also will not retain any copies, notes, or excerpts of Confidential Information upon termination of his/her employment. Employee will promptly notify the Fidelity Companies of any inadvertent, unauthorized, or negligent copying, reproduction, use, disclosure, or discussion of Confidential Information. Employee will not open, read, or in any way access Confidential Information without authorization. The foregoing requirements are subject to the limitations set forth in paragraph 10, below.

2. **Systems Access.** In order to carry out his/her responsibilities, Employee may be given access to various computer systems and passwords, user identifications, or other authenticating information ("password(s)"). Employee will not disclose his/her password(s) to anyone except in accordance with Fidelity policy. While incidental personal use of systems may occur, this is not the purpose of providing access; rather, all systems generally are to be used for legitimate Fidelity business purposes only, and all items created, accessed, or stored will be treated as Fidelity property for all purposes, including but not limited to monitoring, access, recording, review, and disclosure by Fidelity. Employee will adhere to all software licensing or other agreements applicable to systems and to Fidelity's expectations and policies regarding systems usage. Employee's authorization to access Fidelity systems shall expire when Employee leaves Fidelity's employ.



3. **Notice of Electronic Monitoring.**  Any and all telephone conversations or transmissions, electronic mail or transmissions, or internet access or usage by an employee by or using any Fidelity-provided electronic device or system, including but not limited to the use of a Fidelity computer, telephone, wire, radio or electromagnetic, photoelectronic or photo-optical systems (including any of the foregoing provided by you or by any third party that accesses Fidelity's systems) may be subject to monitoring at any and all times and by any lawful means.

4. **Company Property.** Upon termination of Employee's employment, in the event Employee's employment no longer requires access to Confidential Information, or at any earlier time as requested by the Fidelity Companies, Employee will return all company property, including but not limited to his/her identification badge, company credit cards, company-owned equipment (such as cellular telephones, beepers, and laptop computers), and all documents and materials received from or created for or by any of the Fidelity Companies, including but not limited to Confidential Information.

5. **Outside Business Activities.** So long as Employee is employed by the Fidelity Companies, Employee will not engage in any other employment or business activities unless Employee receives prior written approval from the Fidelity Companies in accordance with applicable policies and procedures. Approval for outside activities may be withdrawn at any time.

6. **Ethics and Outside Brokerage Accounts.** So long as Employee is employed by the Fidelity Companies, Employee will adhere to the Code of Ethics for Personal Investing and the Statement of Policies and Procedures on Insider Trading and all other policies, procedures, or guidelines regarding Fidelity's standards for the proper conduct of business. If Employee is an employee of or associated with a registered broker-dealer or registered with the New York Stock Exchange or the Financial Industry Regulatory Authority, Employee will comply with industry agreements, standards, and regulations, and all special policies, compliance standards, and guidelines of the Fidelity Companies applicable to those in regulated businesses. Neither Employee nor Employee's spouse will maintain any brokerage account that either Employee or Employee's spouse owns or in which either Employee or Employee's spouse has a beneficial interest through any non-Fidelity broker-dealer unless Employee receives prior written approval from the Fidelity Companies in accordance with applicable policies and procedures. Approval for an outside account may be withdrawn at any time.

7. **Non-solicitation.** In consideration of the training and/or education and access to Confidential Information provided by the Fidelity Companies, and so as to enforce Employee's agreement regarding such Confidential Information, Employee agrees that during his/her employment and for a period of one year following his/her separation from employment by the Fidelity Companies, Employee will not use any Confidential Information belonging to the Fidelity Companies to directly or indirectly, on his/her own behalf or on behalf of anyone else or any company, solicit in any manner or induce or attempt to induce any customer or prospective customer of the Fidelity Companies to divert or take away all or any portion of his/her/its business from the Fidelity Companies or otherwise cease the relationship with the Fidelity Companies. During this same period, Employee will not directly or indirectly, on his/her own behalf or on behalf of anyone else or any company, solicit in any manner or induce or attempt to induce any customer or prospective customer with whom Employee had personal contact or about whom Employee otherwise learned during the course of Employee's employment with the Fidelity Companies. Employee also will not, directly or indirectly, on his/her own behalf or on behalf of anyone or any company, hire in any manner, or induce or attempt to induce any employee of any of the Fidelity Companies leave his/her employment.

DocuSign Envelope ID: E2E8BEF8-1C2F-495A-AB2B-F6332A20BB5B

7. **Inventions and Use of Name or Likeness.** Employee will disclose and Employee hereby assigns to Fidelity as Fidelity's exclusive property all ideas, writings, inventions, products, methods, techniques, discoveries, improvements, and technical or business innovations (the "Inventions") that Employee makes or conceives, whether or not patentable or copyrightable, either solely or jointly with others, during the period of his/her employment. All written or computer coded materials manifested in documents, systems design, disks, tapes, drawings, reports, specifications, data, memoranda, or otherwise (the "Materials") made or conceived during Employee's employment shall be considered works made for hire, and all right, title, and interest in the Materials shall be owned by the Fidelity Companies. To the extent that the Materials may be held not to be works made for hire, Employee hereby assigns the sole right, title, and interest in the Materials to the Fidelity Companies. In addition, Employee will execute all necessary paperwork and provide all other reasonable assistance requested by any of the Fidelity Companies, either during his/her employment or thereafter, to enable the Fidelity Companies to obtain, maintain, or enforce in itself or its nominees, patents, copyrights, trademarks, or other legal protection on the Inventions in any and all countries. These provisions with respect to Inventions and Materials apply only to Inventions and Materials which (i) are along the lines of the business or work of any of the Fidelity Companies; (ii) result from or are suggested by any work which Employee does for the Fidelity Companies; (iii) are made or conceived using equipment or other materials of the Fidelity Companies; or (iv) are made or conceived during regular hours of work. These provisions do not apply to any invention that qualifies fully under the terms of California Labor Code Section 2870. In addition, Employee hereby authorizes the Fidelity Companies to use, publish, and copyright all or part of his/her name, voice, picture, portrait, and likeness as the Fidelity Companies may decide in their sole discretion, in all media and types of advertising for any product or service or for any other lawful purpose, without review by Employee.

8. **Agreements with Others.** Employee represents and warrants that his/her employment by the Fidelity Companies will not require Employee to violate any agreement Employee may have with any employer or other business, and that Employee will not engage in any activities in violation of any such agreement. Without limiting the foregoing, Employee will not use or disclose to the Fidelity Companies any confidential information belonging to others. Employee further represents and warrants that Employee is not a party to any agreement, and Employee owes no duty to anyone, that limits or affects his/her ability to perform his/her duties for the Fidelity Companies. Employee agrees to disclose to the Fidelity Companies, and provide copies to the Fidelity Companies if copies are available, all confidentiality, inventions, non-solicitation, non-compete, or other restrictive agreements to which Employee is or has been a party.

9. **At Will Employment.** Employee's employment by the Fidelity Companies is at will and may be terminated by Employee or by the Fidelity Companies at any time and for any reason, with or without cause or notice, during or after any applicable initial evaluation period.



10. **Communication with Government Entities.** Nothing in this Agreement shall prohibit or restrict you from (A) communicating directly with, cooperating with, providing or causing to be provided information to, or otherwise assisting in an investigation by the Securities and Exchange Commission, FINRA, the Equal Employment Opportunity Commission, the Department of Justice, or any other government or regulatory agency, entity, or official or self-regulatory organization (collectively, "Government Authority") regarding a possible violation of any law, rule, or regulation; or (B) responding to any inquiry or legal process directed to you individually (and not directed to the Company and/or its subsidiaries) from any such Government Authority, including an inquiry about the existence of this Agreement or its underlying facts or circumstances. Nor does this Agreement require you to obtain prior authorization from the Company before engaging in any conduct described in this paragraph, or to notify the Company that you have engaged in any such conduct. However, in connection with any such activity, you acknowledge that you will take reasonable precautions to ensure that confidential information disclosed to any Government Authority is not made generally available to the public, including by informing the recipient of the confidential nature of the same.

11. **Miscellaneous.** This agreement will continue in full force and effect throughout Employee's tenure with any of the Fidelity Companies, regardless of any changes in Employee's responsibilities, the position Employee holds, or the particular Fidelity Company that employs Employee. Any agreement contrary to any of the provisions of this agreement or modifying this agreement in any way must be in writing and must be signed by the President or Human Resources Vice President of the Fidelity Company for which Employee works. Employee will disclose the existence and terms of this Agreement to any future employer of Employee. Employee's obligations under this Agreement shall survive the termination of Employee's employment with the Fidelity Companies. As to the provisions pertaining to Confidential Information, Employee's obligations shall continue until such time as the Confidential Information becomes known to the general public through no action on Employee's part. Any violation of this Agreement will cause irreparable damage to the Fidelity Companies or any of them. Therefore, the Fidelity Companies or any of them shall have the right to seek specific enforcement of this Agreement through equitable and injunctive relief, in addition to any other remedies available. This agreement will be for the benefit of the Fidelity Companies, its successors, and its assigns. The terms of this Agreement and any dispute out of it shall be governed by, and construed in accordance with, the laws of the state in which Employee currently is or, once Employee is no longer employed, was last, employed by Fidelity, without giving effect to such state's conflict of law principles. This Agreement is signed under seal.

**This agreement contains important information regarding the terms of Employee's employment with the Fidelity Companies. Employee and the Fidelity Companies hereby agree to adhere to it.**

DocuSigned by:

*Ernie Meads*

56228590F5F349B...                                                        5/12/2022

**Candidate eSignature**                                              **eSign Date**

*Kirsten Kuykendoll*

Kirsten Kuykendoll
Head of Talent Acquisition

Updated 07/2021 Fidelity Highly Confidential Information

# EXHIBIT D

# Employee Agreement

Ernie Meads

("Employee") wishes to be employed by FMR LLC and/or any entity that is directly or indirectly, wholly or in part, owned or controlled by or under common control with FMR LLC (the "Fidelity Companies"). As a condition of employment, Employee and the Fidelity Companies agree to abide by this Agreement. This Agreement describes certain aspects of Employee's employment, protects Confidential Information and goodwill of the Fidelity Companies, and assists the Fidelity Companies in complying with their legal, regulatory, and other obligations.

1. **Confidential Information.** To assist Employee in the performance of his/her duties, the Fidelity Companies agree to provide to Employee training and/or education regarding the Fidelity Companies' business methods, and agree to provide to Employee access to certain Confidential Information belonging to the Fidelity Companies. Confidential Information consists of all information pertaining to the business of any of the Fidelity Companies that is not generally known to the public at the time made known to Employee. It includes but is not limited to trade secrets; secret, confidential, and proprietary information; information protected by the attorney-client privilege; marketing, financial, research, trading, portfolio, and sales information; computer passwords and program designs; proprietary computer software designs and hardware configurations; proprietary technology; new product and service ideas; business, pricing, and marketing plans; customer, prospect, vendor, and personnel lists; financial and other personal information regarding customers and employees; confidential information about other companies and their products; and information expressly designated as "Fidelity Highly Confidential," "Fidelity Confidential," or "Fidelity Internal." All Confidential Information is imparted to Employee in a relationship of confidence. As a condition and in consideration of the Fidelity Companies' agreement to provide Employee with training and/or education and Confidential Information, Employee agrees that during his/her employment and thereafter, Employee will not copy, reproduce, use, disclose, or discuss in any manner, in whole or in part, any Confidential Information unless (1) necessary for Employee to carry out his/her job; (2) necessary for employees or other agents of the Fidelity Companies to carry out their duties and responsibilities; or (3) authorized in writing by the Fidelity Companies. Employee also will not retain any copies, notes, or excerpts of Confidential Information upon termination of his/her employment. Employee will promptly notify the Fidelity Companies of any inadvertent, unauthorized, or negligent copying, reproduction, use, disclosure, or discussion of Confidential Information. Employee will not open, read, or in any way access Confidential Information without authorization. The foregoing requirements are subject to the limitations set forth in paragraph 10, below.

2. **Systems Access.** In order to carry out his/her responsibilities, Employee may be given access to various computer systems and passwords, user identifications, or other authenticating information ("password(s)"). Employee will not disclose his/her password(s) to anyone except in accordance with Fidelity policy. While incidental personal use of systems may occur, this is not the purpose of providing access; rather, all systems generally are to be used for legitimate Fidelity business purposes only, and all items created, accessed, or stored will be treated as Fidelity property for all purposes, including but not limited to monitoring, access, recording, review, and disclosure by Fidelity. Employee will adhere to all software licensing or other agreements applicable to systems and to Fidelity's expectations and policies regarding systems usage. Employee's authorization to access Fidelity systems shall expire when Employee leaves Fidelity's employ.

DS
_EM_



3. **Notice of Electronic Monitoring.**  Any and all telephone conversations or transmissions, electronic mail or transmissions, or internet access or usage by an employee by or using any Fidelity-provided electronic device or system, including but not limited to the use of a Fidelity computer, telephone, wire, radio or electromagnetic, photoelectronic or photo-optical systems (including any of the foregoing provided by you or by any third party that accesses Fidelity's systems) may be subject to monitoring at any and all times and by any lawful means.

4. **Company Property.** Upon termination of Employee's employment, in the event Employee's employment no longer requires access to Confidential Information, or at any earlier time as requested by the Fidelity Companies, Employee will return all company property, including but not limited to his/her identification badge, company credit cards, company-owned equipment (such as cellular telephones, beepers, and laptop computers), and all documents and materials received from or created for or by any of the Fidelity Companies, including but not limited to Confidential Information.

5. **Outside Business Activities.** So long as Employee is employed by the Fidelity Companies, Employee will not engage in any other employment or business activities unless Employee receives prior written approval from the Fidelity Companies in accordance with applicable policies and procedures. Approval for outside activities may be withdrawn at any time.

6. **Ethics and Outside Brokerage Accounts.** So long as Employee is employed by the Fidelity Companies, Employee will adhere to the Code of Ethics for Personal Investing and the Statement of Policies and Procedures on Insider Trading and all other policies, procedures, or guidelines regarding Fidelity's standards for the proper conduct of business. If Employee is an employee of or associated with a registered broker-dealer or registered with the New York Stock Exchange or the Financial Industry Regulatory Authority, Employee will comply with industry agreements, standards, and regulations, and all special policies, compliance standards, and guidelines of the Fidelity Companies applicable to those in regulated businesses. Neither Employee nor Employee's spouse will maintain any brokerage account that either Employee or Employee's spouse owns or in which either Employee or Employee's spouse has a beneficial interest through any non-Fidelity broker-dealer unless Employee receives prior written approval from the Fidelity Companies in accordance with applicable policies and procedures. Approval for an outside account may be withdrawn at any time.

7. **Non-solicitation.** In consideration of the training and/or education and access to Confidential Information provided by the Fidelity Companies, and so as to enforce Employee's agreement regarding such Confidential Information, Employee agrees that during his/her employment and for a period of one year following his/her separation from employment by the Fidelity Companies, Employee will not use any Confidential Information belonging to the Fidelity Companies to directly or indirectly, on his/her own behalf or on behalf of anyone else or any company, solicit in any manner or induce or attempt to induce any customer or prospective customer of the Fidelity Companies to divert or take away all or any portion of his/her/its business from the Fidelity Companies or otherwise cease the relationship with the Fidelity Companies. During this same period, Employee will not directly or indirectly, on his/her own behalf or on behalf of anyone else or any company, solicit in any manner or induce or attempt to induce any customer or prospective customer with whom Employee had personal contact or about whom Employee otherwise learned during the course of Employee's employment with the Fidelity Companies. Employee also will not, directly or indirectly, on his/her own behalf or on behalf of anyone or any company, hire in any manner, or induce or attempt to induce any employee of any of the Fidelity Companies leave his/her employment.

7. **Inventions and Use of Name or Likeness.** Employee will disclose and Employee hereby assigns to Fidelity as Fidelity's exclusive property all ideas, writings, inventions, products, methods, techniques, discoveries, improvements, and technical or business innovations (the "Inventions") that Employee makes or conceives, whether or not patentable or copyrightable, either solely or jointly with others, during the period of his/her employment. All written or computer coded materials manifested in documents, systems design, disks, tapes, drawings, reports, specifications, data, memoranda, or otherwise (the "Materials") made or conceived during Employee's employment shall be considered works made for hire, and all right, title, and interest in the Materials shall be owned by the Fidelity Companies. To the extent that the Materials may be held not to be works made for hire, Employee hereby assigns the sole right, title, and interest in the Materials to the Fidelity Companies. In addition, Employee will execute all necessary paperwork and provide all other reasonable assistance requested by any of the Fidelity Companies, either during his/her employment or thereafter, to enable the Fidelity Companies to obtain, maintain, or enforce in itself or its nominees, patents, copyrights, trademarks, or other legal protection on the Inventions in any and all countries. These provisions with respect to Inventions and Materials apply only to Inventions and Materials which (i) are along the lines of the business or work of any of the Fidelity Companies; (ii) result from or are suggested by any work which Employee does for the Fidelity Companies; (iii) are made or conceived using equipment or other materials of the Fidelity Companies; or (iv) are made or conceived during regular hours of work. These provisions do not apply to any invention that qualifies fully under the terms of California Labor Code Section 2870. In addition, Employee hereby authorizes the Fidelity Companies to use, publish, and copyright all or part of his/her name, voice, picture, portrait, and likeness as the Fidelity Companies may decide in their sole discretion, in all media and types of advertising for any product or service or for any other lawful purpose, without review by Employee.

8. **Agreements with Others.** Employee represents and warrants that his/her employment by the Fidelity Companies will not require Employee to violate any agreement Employee may have with any employer or other business, and that Employee will not engage in any activities in violation of any such agreement. Without limiting the foregoing, Employee will not use or disclose to the Fidelity Companies any confidential information belonging to others. Employee further represents and warrants that Employee is not a party to any agreement, and Employee owes no duty to anyone, that limits or affects his/her ability to perform his/her duties for the Fidelity Companies. Employee agrees to disclose to the Fidelity Companies, and provide copies to the Fidelity Companies if copies are available, all confidentiality, inventions, non-solicitation, non-compete, or other restrictive agreements to which Employee is or has been a party.

9. **At Will Employment.** Employee's employment by the Fidelity Companies is at will and may be terminated by Employee or by the Fidelity Companies at any time and for any reason, with or without cause or notice, during or after any applicable initial evaluation period.



10. **Communication with Government Entities.** Nothing in this Agreement shall prohibit or restrict you from (A) communicating directly with, cooperating with, providing or causing to be provided information to, or otherwise assisting in an investigation by the Securities and Exchange Commission, FINRA, the Equal Employment Opportunity Commission, the Department of Justice, or any other government or regulatory agency, entity, or official or self-regulatory organization (collectively, "Government Authority") regarding a possible violation of any law, rule, or regulation; or (B) responding to any inquiry or legal process directed to you individually (and not directed to the Company and/or its subsidiaries) from any such Government Authority, including an inquiry about the existence of this Agreement or its underlying facts or circumstances. Nor does this Agreement require you to obtain prior authorization from the Company before engaging in any conduct described in this paragraph, or to notify the Company that you have engaged in any such conduct. However, in connection with any such activity, you acknowledge that you will take reasonable precautions to ensure that confidential information disclosed to any Government Authority is not made generally available to the public, including by informing the recipient of the confidential nature of the same.

11. **Miscellaneous.** This agreement will continue in full force and effect throughout Employee's tenure with any of the Fidelity Companies, regardless of any changes in Employee's responsibilities, the position Employee holds, or the particular Fidelity Company that employs Employee. Any agreement contrary to any of the provisions of this agreement or modifying this agreement in any way must be in writing and must be signed by the President or Human Resources Vice President of the Fidelity Company for which Employee works. Employee will disclose the existence and terms of this Agreement to any future employer of Employee. Employee's obligations under this Agreement shall survive the termination of Employee's employment with the Fidelity Companies. As to the provisions pertaining to Confidential Information, Employee's obligations shall continue until such time as the Confidential Information becomes known to the general public through no action on Employee's part. Any violation of this Agreement will cause irreparable damage to the Fidelity Companies or any of them. Therefore, the Fidelity Companies or any of them shall have the right to seek specific enforcement of this Agreement through equitable and injunctive relief, in addition to any other remedies available. This agreement will be for the benefit of the Fidelity Companies, its successors, and its assigns. The terms of this Agreement and any dispute out of it shall be governed by, and construed in accordance with, the laws of the state in which Employee currently is or, once Employee is no longer employed, was last, employed by Fidelity, without giving effect to such state's conflict of law principles. This Agreement is signed under seal.

**This agreement contains important information regarding the terms of Employee's employment with the Fidelity Companies. Employee and the Fidelity Companies hereby agree to adhere to it.**

DocuSigned by:

*Ernie Meads*

56228590F5F349B...

11/23/2022

**Candidate eSignature**                                                                                  **eSign Date**

*Kirsten Kuykndll*

Kirsten Kuykendoll

Head of Talent Acquisition

Updated 07/2021 Fidelity Highly Confidential Information

# EXHIBIT E

# Employee and Arbitration Agreement

Ernie Meads ("Employee") wishes to be employed by FMR LLC or an entity that is directly or indirectly, wholly  or in part, owned or controlled by or under common control with FMR LLC ("Fidelity").  In consideration of Fidelity employing, or continuing to employ, Employee, compensating Employee, providing Employee with access to Confidential Information and/or access to Fidelity's customers and clients, and the opportunity to develop and maintain relationships and goodwill with them, and/or other good and valuable consideration, the adequacy, sufficiency and receipt of which is hereby acknowledged, and intending to be legally bound, the undersigned Employee enters into this Employee and Arbitration Agreement ("Agreement").

**1.** **At-Will Employment.** Employee's employment by Fidelity is at-will and may be terminated by Employee or by Fidelity at any time and for any reason, with or without cause or notice.

**2.** **Company Property.** Upon termination of Employee's employment, in the event Employee's employment no longer requires access to Confidential Information (as defined in paragraph 6 below), or at any earlier time as requested by Fidelity, Employee will return all company property, including but not limited to Employee's identification badge, company credit cards, company-owned equipment (such as mobile telephones, iPads, and laptop computers), and all documents and materials received from or created for or by Fidelity, including but not limited to Confidential Information.

**3.** **Systems Access.** In order to carry out Employee's responsibilities, Employee may be given access to various computer systems and passwords, user identifications, or other authenticating information ("password(s)"). Employee will not disclose  such password(s) to anyone except in accordance with Fidelity policy. While incidental personal use of systems may occur, this is not the purpose of providing access; rather, all systems generally are to be used for legitimate Fidelity business purposes only, and all items created, accessed, or stored will be treated as Fidelity property for all purposes, including but not limited to monitoring, access, recording, review, and disclosure by Fidelity. Employee will adhere to all software licensing or other agreements applicable to systems and to Fidelity's expectations and policies regarding systems usage. Employee's authorization to access Fidelity systems shall expire when Employee leaves Fidelity's employ.

**4.** **Outside Business Activities.** So long as Employee is employed by Fidelity, Employee will not participate in any other employment or non-Fidelity business activities ("Outside Business Activities") that are (i) prohibited by law or Fidelity policy, (ii) involve the improper use of Fidelity time, information, equipment, facilities, or other resources, or (iii) have not been approved in writing by Fidelity in accordance with applicable policies and procedures. Fidelity may withdraw its approval of Employee's Outside Business Activities at any time in Fidelity's sole discretion.

**5.** **Ethics and Outside Brokerage Accounts.** So long as Employee is employed by Fidelity, Employee will adhere to all codes of conduct, policies, procedures, and guidelines applicable to Fidelity employees, including, without limitation, policies regarding personal trading and handling of inside information, as the same may be modified at any time at Fidelity's discretion. If Employee is, or becomes, associated with a registered broker-dealer, investment adviser, or other registered or regulated entity, whether as an employee, representative or agent, or Employee is, or becomes, a licensed, registered, or otherwise certified or approved person of any state or federal authority, self-regulatory agency, or registered exchange, Employee must comply with all applicable industry agreements, standards, rules, regulations, and requirements, and all special policies, compliance standards, and guidelines of Fidelity applicable to those in regulated  businesses. Neither Employee nor Employee's spouse or domestic partner nor Employee's immediate family members living in Employee's household who Employee financially supports or who financially support Employee will maintain any brokerage account which Employee, Employee's spouse or domestic partner, or such other immediate family members own or control through any non-Fidelity broker-dealer unless Employee receives prior written approval from Fidelity in accordance with applicable policies and procedures. Fidelity may withdraw its approval of such outside brokerage account at any time in Fidelity's sole discretion.

**6.** **Confidential Information.** To assist Employee in the performance of their duties, Fidelity agrees to provide to Employee access to certain Confidential Information belonging to Fidelity. "Confidential Information" consists of all information pertaining to Fidelity's business that is not generally known to the public or to competitors who could profit from its use or disclosure to them. It includes but is not limited to trade secrets; secret, confidential, and proprietary information; information protected by the attorney-client privilege; marketing, financial, research, trading, portfolio, and sales information; computer passwords and program designs; proprietary computer software designs and hardware configurations; proprietary technology; new product and service ideas; business, pricing, and marketing plans; customer, prospect, vendor, and personnel lists; financial and other personal information regarding customers; confidential information about other companies and their products; and information Fidelity expressly designated as "Fidelity Highly Confidential," "Fidelity Confidential," or "Fidelity Internal." All Confidential Information is imparted to Employee in a relationship of confidence. Employee agrees that both during and after Employee's employment, Employee will not retain, copy, reproduce, use, disclose, or discuss in any manner, in whole or in part, any Confidential Information regardless of format or whether committed, in whole or in part, to Employee's memory, except as (1) necessary for Employee to carry out Employee's job on behalf of Fidelity; (2) necessary for employees or other agents of Fidelity to carry out their duties and responsibilities; (3) authorized in writing by Fidelity; or (4) permitted by applicable law. Employee will promptly notify Fidelity of any inadvertent, unauthorized, or negligent copying, reproduction, use, disclosure, or discussion of Confidential Information. Notwithstanding the forgoing, note the Permitted Section 13 below.

**7.    Inventions and Materials.** Employee will disclose and Employee hereby assigns to Fidelity as Fidelity's exclusive property all ideas, writings, inventions, products, methods, techniques, discoveries, improvements, and technical or business innovations (the "Inventions") that Employee makes or conceives, whether or not patentable or copyrightable, either solely or jointly with others, during Employee's employment. All written or computer coded materials manifested in documents, systems design, disks, tapes, drawings, reports, specifications, data, memoranda, or otherwise (the "Materials") made or conceived during Employee's employment shall be considered works made for hire, and all right, title, and interest in the Materials shall be owned by Fidelity. To the extent that the Materials may be held not to be works made for hire, Employee hereby assigns the sole right, title, and interest in the Materials to Fidelity. In addition, Employee will execute all necessary paperwork and provide all other reasonable assistance Fidelity requests, either during or after Employee's employment, to enable Fidelity to obtain, maintain, or enforce in itself or its nominees, patents, copyrights, trademarks, or other legal protection on the Inventions and/or Materials in any and all countries. These provisions with respect to Inventions and Materials apply only to Inventions and Materials which (i) are along the lines of the business or work of any of Fidelity; (ii) result from or are suggested by any work which Employee does for Fidelity; (iii) are made or conceived using equipment or other materials of Fidelity; or (iv) are made or conceived during regular hours of work. Employee agrees not to assert any right against Fidelity with respect to any patent, invention which is not patented, or materials created prior to executing this Agreement ("Prior IP"). Employee further agrees to grant to Fidelity a license to use such Prior IP if such employee makes Prior IP available to Fidelity during the term of Employee's employment and Fidelity agrees to use such Prior IP. This paragraph 7 does not apply to any invention that qualifies fully under the terms of California Labor Code Section 2870.

**8.    Use of Employee Name, Image, and Likeness.** To the maximum extent permitted by law, Employee hereby authorizes Fidelity to use, publish, and copyright all or part of  Employee's name, voice, image, and likeness as Fidelity may decide in its sole discretion, in all media and types of advertising or for any other lawful purpose, without review by Employee. Employee also grants to Fidelity an irrevocable, transferable, assignable, licensable, royalty-free, and perpetual non-exclusive right and license to record, capture, use, reproduce, and display Employee's name, voice, image, and likeness for any and all lawful purposes, including in all types of Social Media platforms (now known or hereafter existing), without additional compensation, payment, or other consideration of any kind. Employee releases Fidelity from any liability to Employee related to Fidelity's permitted use of Employee's name, voice, image and likeness in accordance with this Agreement. Further, during Employee's employment with Fidelity, Employee will not use or grant any competitor a license to use Employee's name, voice, image, or likeness for any commercial purpose.

**9.    Non-Solicitation – Customers & Prospective Customers.** In consideration of the access to Confidential Information provided by Fidelity, to protect the goodwill and relationships of Fidelity with its customers and prospective customers, and so as to enforce Employee's agreement regarding such Confidential Information, to the maximum extent permitted by law, Employee agrees that during Employee's employment and for a period of one year following Employee's separation from employment by Fidelity, Employee will not directly or indirectly, on Employee's own behalf or on behalf of anyone else or any company or entity, solicit in any manner, or induce or attempt to induce, any Customer or Prospective Customer for the purpose of inviting, encouraging, or requesting any such Customer or Prospective Customer (a) to transfer accounts from Fidelity to any other person or firm that does business in any line of business in which Fidelity is engaged, (b) to sever any investment advisory relationship in favor of obtaining investment advice elsewhere, whether or not assets are transferred out of Fidelity, or (c) to otherwise discontinue or reduce the scope of the Customer's or Prospective Customer's business relationship with Fidelity. A "Customer" is any customer of Fidelity with whom Employee had personal contact or about whom Employee otherwise gained information  during  the  twenty-four months immediately preceding Employee's  separation from employment  with  Fidelity. A "Prospective Customer" is any individual or entity as to which Employee was personally involved in making a proposal or discussions regarding potentially becoming a customer of Fidelity, or about which Employee gained information regarding such proposals or discussions, in either case at any time during  the  twenty-four months immediately preceding  Employee's separation from employment  with  Fidelity. This provision does not preclude Employee from doing business with a Customer or Prospective Customer if that Customer or Prospective Customer approaches the Employee on their own without any direct or indirect attempts by the Employee to cause that Customer or Prospective Customer to do so.

**10.    Non-Solicitation – Employees.** To the maximum extent permitted by law, Employee further agrees that during Employee's employment and for a period of one year following Employee's separation from employment by Fidelity, Employee will not, directly or indirectly, on Employee's own behalf or on behalf of anyone or any company or entity, recruit or solicit in any manner, or induce or attempt to induce, any Fidelity employee (a) with whom Employee had direct contact for business purposes or (b) whom Employee knew about because of Employee's access to Fidelity's Confidential Information or trade secrets, to leave such employee's employment with Fidelity. This provision does not prevent the hiring of individuals who proactively respond to general advertisements or affirmatively approach Employee's new employer directly without any direct or indirect attempts by the Employee to cause that individual to do so.

**11.    Injunctive Relief.**

**(a)    Remedy for Breach.** Employee agrees that the restrictions and other provisions of this Agreement are reasonable, fair and equitable in scope, terms, and duration, and necessary for the protection of Fidelity, its goodwill, relationships, and to protect its Confidential Information, and that any breach of the Agreement would cause Fidelity to suffer immediate and irreparable harm in a way that cannot be adequately compensated for by a monetary damage award and for which there is no adequate remedy at law. Accordingly, if Employee breaches or threatens to breach Employee's obligations under this Agreement, Fidelity shall be entitled to equitable relief, including but not limited to temporary, preliminary, and permanent injunctive relief enforcing specific performance of this Agreement and/or enjoining or restraining Employee from any violation or threatened violations of the provisions of this Agreement, in addition to any other remedy to which it may be entitled at law or in equity. Employee hereby consents to the entry of any such injunctive relief without the posting of a bond by Fidelity, and Employee hereby waives any defense that an a remedy at law exists or any other defense that would bar relief in the form of specific performance or any other equitab l



Employee also acknowledges and agrees that Fidelity's rights to obtain injunctive relief under this Agreement shall not be considered a waiver of Fidelity's rights to seek or obtain any other remedies or damages that may be available, and that the restrictions and obligations in this Agreement are in addition to any restrictions and obligations imposed on Employee by applicable law.  Further, a waiver by Fidelity of Employee's breach of any provisions of this Agreement shall not be deemed a waiver of any subsequent breach, nor shall recourse to any remedy hereunder be deemed a waiver of any other or further relief or remedy provided for herein or otherwise by law.

(b) **Temporary/Preliminary Relief.** Employee and Fidelity agree that any requests for temporary and/or preliminary injunctive relief in aid of arbitration or for the maintenance of the status quo pending arbitration shall be adjudicated exclusively in a court of competent jurisdiction, even if Employee and Fidelity are parties to an arbitration agreement (including, but not limited to, the Mutual Arbitration provision in paragraph 12). Employee agrees that the injunctive relief to which Employee consents hereinabove, shall be granted by a court of competent jurisdiction pending arbitration in order to preserve the status quo, with the merits of any Covered Claim (as defined below) to be heard in arbitration.

(c) **Impact on Covenants.** Employee agrees that the duration of any injunction shall be increased in an amount equal to any period of time during which Employee failed to comply with the covenants contained in this Agreement.

(d) **Discovery.** Employee agrees that in any proceeding alleging breach of this Agreement (whether in court or in arbitration), Fidelity and Employee each shall have the right to engage in deposition and document discovery, and Fidelity shall have the right to conduct forensic examination(s) of any computers and/or electronic devices in Employee's possession or control, if Fidelity reasonably believe such devices contain Confidential Information or other property belonging to Fidelity. Fidelity and Employee further agree that in connection with any application for injunctive relief to enforce this Agreement (including without limitation any application for temporary and/or preliminary injunctive relief), the foregoing discovery shall be conducted on an expedited basis, including expedited document and deposition discovery, whether or not the laws of the jurisdiction or rules of arbitration procedure provide for said expedited discovery. This agreement to expedited discovery modifies and supplements the terms of any applicable arbitration agreement and is an essential term of any agreement to arbitrate.

**12.    Mutual Arbitration**.

(a) **Scope**. Employee and Fidelity agree that, in exchange for the valid consideration described above and this Mutual Arbitration Agreement, all "Covered Claims" (as defined below) between Employee and Fidelity will be submitted to confidential, final, and binding arbitration in accordance with this paragraph 12.

(b) **Covered Claims**. Except for "Excluded Claims" (as defined below), and to the maximum extent permitted by law, all disputes, claims, complaints or controversies that Employee has had, has now, or has at any time in the future against Fidelity and/or any of their parents, subsidiaries, affiliates, predecessors, successors, or assigns, or any of its and their current and former officers, directors, employees and/or agents, or that Fidelity has had, has now, or has at any time in the future against Employee, including any claims directly or indirectly based on, arising out of, or in any way relating to Employee's recruitment, application, terms and conditions of employment, compensation, and separation of employment with Fidelity including, but not limited to, contract, tort, defamation, breach of fiduciary duty and other common law claims, wage and hour claims, statutory discrimination, harassment and retaliation claims, and claims under, based on, or relating to any federal, state, or local constitution, statute or regulation, and any and all other federal, state, or local constitutional, statutory, regulatory, or common law claims or causes of action now or hereafter recognized (collectively "Covered Claims"), are subject to arbitration pursuant to this paragraph 12 and will be resolved by arbitration and not by a court or jury.

(c) **Excluded Claims.** The following claims and disputes ("Excluded Claims") are not subject to the arbitration requirement contained in this paragraph 12:

    1)  For employees registered with the Financial Industry Regulatory Authority ("FINRA"), claims that are required and eligible to be arbitrated under the FINRA Code of Arbitration Procedure for Industry Disputes (except that if a Covered Claim may not be arbitrated before FINRA or is ineligible for, otherwise excluded from, or not subject to arbitration before, FINRA, then any arbitration of such Covered Claim shall be conducted in accordance with this Mutual Arbitration provision);

    2)  Claims that may not be subject to a pre-dispute arbitration agreement under the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act (at Employee's election);

    3)  Requests for temporary and/or preliminary injunctive relief in aid of arbitration or for the maintenance of the status quo pending arbitration, with the merits of any Covered Claim to be heard in arbitration;

    4)  Claims for workers' compensation or unemployment compensation benefits, but not retaliation claims arising out of or relating to claims for workers' compensation or unemployment compensation benefits;

    5)  Claims under the National Labor Relations Act, as amended within the exclusive jurisdiction of the National Labor Relations Board;

    6)  Claims arising under the terms and conditions of the Fidelity share programs; and

    7)  Any claim that is expressly precluded from arbitration by a governing federal statute.

    If any Excluded Claim is combined with Covered Claims, Employee and Fidelity agree to sever the Excluded Claims

Page 3



case they bring, and to pursue the Excluded Claim in a case separate from the Covered Claims, which will be arbitrated to the maximum extent permitted by the Federal Arbitration Act.

**(d)  Class and Collective Action Waiver.**

1)  <u>Waiver of Class and Collective Actions.</u> To the maximum extent permitted by applicable law, Employee and Fidelity agree to bring any Covered Claim on an individual basis only and waive any right for any Covered Claim to be initiated, brought, heard, joined, or maintained as a class action or collective action, either in court or in arbitration. Further, the arbitrator shall not have the authority to: (A) consolidate or join claims by different persons into one proceeding; (B) determine whether the Covered Claim should proceed to final adjudication as a class action or collective action; (C) allow any Covered Claim to proceed in arbitration as a class action or collective action; and/or (D) award relief on a class or collective basis with respect to any Covered Claim. Employee and Fidelity also agree that Employee is not entitled to serve or participate as a member of, or receive recovery from, a class action or collective action involving any Covered Claim either in court or arbitration.

2)  <u>California Private Attorneys General Act ("PAGA") Individual Action Requirement.</u> Employee and Fidelity agree to arbitrate any PAGA claim by Employee to recover any unpaid wages, civil penalties as to Employee's individual claim, or other individual relief. The arbitrator is without authority to preside over any non-individual PAGA claim, meaning any PAGA claim by Employee for penalties associated with violations and/or injuries that a party to the arbitration did not directly experience themselves. This PAGA Individual Action Requirement clause, or any portion thereof, will be severable from this Agreement if there is a final judicial determination that it is invalid, unenforceable, unconscionable, void, or voidable. In such case, the PAGA action must be litigated in a civil court of competent jurisdiction—not in arbitration—but the portion of this PAGA Individual Action Requirement that is enforceable shall be enforced in arbitration.

3)  <u>Court to Decide Enforceability of the Class and Collective Action Waiver.</u> A court of competent jurisdiction, not an arbitrator, shall resolve any dispute regarding the validity, enforceability, or breach of the Class and Collective Action Waiver and/or PAGA Individual Action Requirement. If, for any reason, the Class and Collective Action Waiver and/or PAGA Individual Action Requirement are held unenforceable or invalid in whole or in part, then a court of competent jurisdiction, not an arbitrator, will decide the claim as to which the waiver was held unenforceable or invalid and all other claims will remain subject to arbitration.

4)  <u>Right to Challenge Validity of this Policy.</u> Employee has the right to challenge the validity of the terms and conditions of this Mutual Arbitration provision on any grounds that may exist in law and equity, and Fidelity shall not discipline, discharge, or engage in any retaliatory actions against Employee in the event Employee chooses to do so. Fidelity, however, reserves the right to enforce this Mutual Arbitration provision.

**(e)  Forum and Rules.**

1)  <u>JAMS Rules.</u> Except as modified in this Agreement, any arbitration of a Covered Claim will be resolved by final and binding arbitration conducted under the auspices and rules of JAMS in accordance with and subject to the JAMS Employment Arbitration Rules and Procedures and the JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness ("JAMS Rules") in effect at the time of the arbitration or any successor rules. The JAMS Rules are available at http://www.jamsadr.com/rules-employment-arbitration/. If there is any conflict between the JAMS Rules and this Mutual Arbitration provision, this Mutual Arbitration provision shall govern. This paragraph does not apply to arbitration at FINRA.

2)  <u>Location.</u> Any arbitration shall occur in the city/county of Employee's assigned work location at the time of the arbitration or, if they are no longer employed by Fidelity, the city/county of Employee's most recently assigned work location by Fidelity, unless otherwise agreed to by Employee and Fidelity.

3)  <u>Authority of Arbitrator.</u> The arbitrator shall be authorized to make awards including any remedy or relief provided by statute or common law under which the claim or dispute arises that would be available if the Covered Claim had been filed in a court of competent jurisdiction. The arbitrator shall have no authority to make awards beyond said remedy or relief. The arbitrator may award reasonable attorneys' fees and expenses only if expressly permitted by the applicable statute, law, or contract. In the absence of such an express requirement, the arbitrator shall not have the authority to award attorneys' fees and expenses to either Employee or Fidelity. The arbitrator shall not have authority to consider any claim that has not been administratively exhausted as required by statute, that is barred by an applicable statute of limitations, or that is otherwise raised in an untimely fashion as provided by applicable law. Except as expressly precluded by federal law, any issue concerning arbitrability of a particular issue or claim pursuant to this Mutual Arbitration provision (excluding issues concerning the validity or enforceability of the Class and Collective Action Waiver and/or PAGA Individual Action Requirement) must be resolved by the arbitrator, not a court.

4)  <u>Law Governing Arbitration.</u> The arbitrator shall follow and apply the substantive law, and be subject to the same rules of evidence and burdens of proof, that would have governed the Covered Claims had they been heard in court. The arbitrator shall not enlarge, add to, subtract from, disregard, or otherwise alter the parties' rights under the applicable law. In reaching a decision, the arbitrator shall be bound by the law and shall have no power to vary from said law.

5)  <u>Procedure & Dispositive Motion Practice.</u> The Employee and Fidelity may file, and the arbitrator must hear and d___ ___ __ y motion permitted by the Federal Rules of Civil Procedure, including, but not limited to, motions to compel discove__ ___ ns



for protective orders, motions to dismiss, motions for summary judgment, and motions in limine or any other dispositive motion. The arbitrator shall issue an appropriate protective order prior to the production of any relevant and discoverable Confidential Information or other non-publicly available documents or information requiring that such materials be treated as confidential at all times during and after the arbitration.

6)   Modification of Deadlines. The Employee and Fidelity shall have thirty (30) calendar days to file a responsive pleading after the receipt of a Statement of Claims or Counterclaims. Either party may amend their Statement of Claim(s), or Counterclaims but only before the other party has served a responsive pleading. If either party timely amends their Statement of Claim(s), or Counterclaims, the other party shall have an additional thirty (30) calendar days to file a responsive pleading. Neither Fidelity nor the Employee may amend their Statement of Claim(s), or Counterclaims after being served a responsive pleading unless the other party agrees or the arbitrator approves such filing

7)   Awards. The award shall include a reasoned and detailed decision stating the reasons upon which it is based and supported by essential facts and conclusions of law, and subject to review on the grounds set forth in the Federal Arbitration Act. No arbitration award or decision shall have any preclusive effect as to any issues or claims in any other arbitration or court proceeding unless each of the parties in such proceeding was also a named party in the original arbitration and the issue and/or claims were actually litigated and decided by the arbitrator.

8)   Appeal. The Parties adopt and agree to implement the operative JAMS Optional Arbitration Appeal Procedure ("Appeal Procedure") with respect to any final award in a JAMS arbitration arising out of or related to this Agreement where the plausible amount in controversy is greater than or equal to $1,000,000. The Appeal Procedure includes that:

- An appeal may be made to a separate panel of three JAMS arbitrators (or a single arbitrator if the parties so agree).

- The standard of review will be the "same standard…that the first-level appellate court in the jurisdiction would apply to an appeal from the trial court decision."

- A decision will be rendered within twenty-one (21) calendar days of oral argument or service of final briefs, which will not exceed twenty-five (25) double-spaced pages.

9)   Arbitration Fees. Except as otherwise required by federal law, Employee shall be responsible for any filing fee required to initiate arbitration or to assert any counterclaims up to the amount of the filing fee Employee would have incurred had Employee filed such claims in court, and Fidelity shall be responsible for all additional arbitration filing fees, forum fees, arbitrator fees, and other administrative fees and costs of the arbitration forum.

(f)   **Governing Law**. This Mutual Arbitration provision will be governed by and enforced under the Federal Arbitration Act ("FAA"), 9 U.S.C. section 1 *et seq*.

**13.    Permitted Conduct.** Nothing in this Agreement shall prohibit or restrict Employee (or Employee's attorney) from (A) filing a charge or complaint, or participating in an investigation, with any federal administrative agency, including the U.S. Equal Employment Opportunity Commission ("EEOC"), the National Labor Relations Board ("NLRB"), the U.S. Department of Labor ("DOL"), the Occupational Safety and Health Administration ("OSHA"), the Department of Justice, Securities Exchange Commission ("SEC"), the Congress, any agency Inspector General, or any other governmental or regulatory agency, entity or self-regulatory organization (collectively, "Governmental Authorities"); (B) filing a charge or complaint with, communicating directly with, cooperating with, providing or causing to be provided information obtained to, participating in an investigation with, or otherwise assisting in an investigation by any Governmental Authority for purposes of allowing such agency to conduct an investigation or bring an action in its own name regarding a possible violation of any law, rule, or regulation; (C) responding to any inquiry or legal process directed to Employee individually (and not directed to Fidelity and/or its subsidiaries) from any such Governmental Authorities, including an inquiry about the existence of this Agreement or its underlying facts or circumstances; (D) testifying, participating or otherwise assisting in an action or proceeding by any such Governmental Authorities relating to a possible violation of law; (E) making any other disclosures which are permitted under the whistleblower provisions of any applicable law, rule, or regulation; or (F) disclosing information relating to workplace issues, or from assisting current or former colleagues, or from communicating with others, including third parties, a union, or the National Labor Relations Board, about Employee's employment. In the event Employee files an administrative proceeding, Employee understands that Employee cannot pursue Covered Claims under this Mutual Arbitration provision without first exhausting all required administrative remedies, such as obtaining a right to sue notice from the EEOC in order to arbitrate federal discrimination claims that require such notice. Notwithstanding the foregoing, to the maximum extent permitted by law, this paragraph does not exclude from arbitration Covered Claims for relief before a state or local administrative agency where such agency would be acting as an adjudicator of Employee's claim. Additionally, pursuant to the Federal Defend Trade Secrets Act of 2016, Employee shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made to Employee's attorney in relation to a lawsuit for retaliation against you or reporting a suspected violation of law; or (c) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Nor does this Agreement require Employee to obtain prior authorization from Fidelity before engaging in any conduct described in this paragraph, or to notify Fidelity that Employee has engaged in any such conduct. Fidelity will not condone any form of retaliation for communicating with a Governmental Authority.

**14.    Severability.** Other than the Class and Collective Action Waiver and/or PAGA Individual Action requirement, which are governed by the specific severability provisions set forth above in paragraph 12(d), each section, provision, paragraph, clause, and subparagraph (collectively "Provision") of this Agreement shall be severable from each other and, if for any reason, any P... is held to be invalid or unenforceable, then such Provision shall be deemed to be modified or restricted to the extent and in... er

Page 5



necessary to render the same valid and enforceable, or shall be deemed excised from this Agreement, as the case may require, and this Agreement shall be construed and enforced to the maximum extent permitted by law, as if such Provision had been originally incorporated in this Agreement as so modified or restricted, or if such Provision had not been originally incorporated herein, as the case may be. Further, any Provision that is held to be invalid or unenforceable shall not prejudice or in any way affect the validity or enforceability of any other Provision.

**15. Miscellaneous.**

**(a) Full and Complete Understanding.** This Agreement constitutes the complete, final, and exclusive embodiment of the entire agreement between Employee and Fidelity with regard to its subject matter. It is entered into without reliance on any promise or representation, written or oral, other than those expressly contained herein, and it supersedes any other such promises, warranties, representations, or prior written agreements between Employee and Fidelity with regard to its subject matter.

**(b) Survival.** This Agreement will continue in full force and effect throughout Employee's tenure with Fidelity, regardless of any changes in Employee's responsibilities, the position Employee holds, or whether Employee becomes employed by another entity that is directly or indirectly, wholly or in part, owned or controlled by or under common control with FMR LLC. Further, Employee's obligations under this Agreement shall survive the termination of Employee's employment with Fidelity.

**(c) Modifications.** This Agreement may not be modified or amended in any way except in a writing by the Head of Human Resources for Fidelity or their designee.

**(d) Employee Representation.** Employee will disclose the existence and terms of paragraphs 6, 9 and 10 of this Agreement to any prospective or future employer of Employee.

**(e) Successors.** Fidelity's rights and obligations under this Agreement will be binding upon its successors, affiliated entities, and assigns. Employee's rights and obligations under this Agreement will be binding upon Employee's heirs, legatees, personal representatives, executors, and administrators. Employee may not assign, transfer, pledge, or in any way encumber this Agreement.

**(f) Governing Law.** The terms of this Agreement, other than the Mutual Arbitration provision (which is governed by the Governing Law provision set forth above in paragraph 12(f)), shall be governed by, and construed in accordance with, the laws of the state to which Employee was last assigned to work by Fidelity, without giving effect to such state's conflict of law principles.

**This agreement contains important information regarding the terms of Employee's employment with Fidelity. Employee and Fidelity hereby agree to adhere to it. Employee further certifies that Employee has read and understands this Agreement and the restrictions contained herein, including the Mutual Arbitration provision, and has had an opportunity to consult with legal counsel prior to signing. Employee understands that Fidelity hereby advises that Employee should consult with an attorney prior to signing this Agreement. Employee acknowledges that this Agreement may be accepted and agreed to electronically, and that an electronic copy, hard copy, or acknowledgement is as enforceable as an original.**

**NOTICE: Employees in Alabama, California, Colorado, Illinois, Oklahoma, or Wisconsin should see "Appendix To Employee and Arbitration Agreement – State-Specific Terms" pages that follow for important limitations on the terms in Paragraphs 6, 9, 10, 11, and/or 15, depending on location.**

┌ DocuSigned by:

*Ernie Meads*

└ 56228590F5F349B...

**Employee  eSignature**

11/9/2023

**eSign Date**

*Kirsten Kuykendoll*

Kirsten Kuykendoll
Head of Talent Acquisition

Updated 7/2023



| APPENDIX TO EMPLOYEE AND ARBITRATION AGREEMENT -- STATE-SPECIFIC TERMS |
|---|

| ALABAMA |
|---|

If at the time of Employee's termination of employment with Fidelity, Employee had been primarily working for Fidelity in Alabama or had been primarily residing in Alabama while working for Fidelity, then the following provisions apply and modify the terms of this Agreement:

**9.** **Non-Solicitation – Customers.** The restrictions contained in Paragraph 9 shall apply only for so long as Fidelity carries on a like business.

**10.** **Non-Solicitation – Employees**. In addition to the limitations on the restrictions already stated in Paragraph 10, the restriction on solicitation of employees is further limited to prohibit only solicitation of those agents, servants, or employees of Fidelity who hold a position uniquely essential to the management, organization, or service of Fidelity's business.

| CALIFORNIA |
|---|

If at the time of Employee's termination of employment with Fidelity, Employee had been primarily working for Fidelity in California or had been primarily residing in California while working for Fidelity, then the following provisions apply and modify the terms of this Agreement:

**9.** **Non-Solicitation – Customers.** The provisions of Paragraph 9 shall be rewritten as follows: "Employee shall not directly or indirectly use Fidelity's trade secrets (a) to identify existing Fidelity Customers for Employee's own benefit or the benefit of any other firm or entity, (b) to facilitate solicitation, for Employee's benefit or the benefit of any other firm or entity, of Fidelity Customers, and/or (c) to otherwise compete unfairly with Fidelity."

**15(f).** **Miscellaneous. Governing Law.** In Paragraph 15(f) the phrase, "…the state to which Employee was last assigned to work by Fidelity," shall be rewritten as "the State of California," for employees who work or reside in California.

| COLORADO |
|---|

If at the time of Employee's termination of employment, Employee had been primarily working for Fidelity in Colorado or had been primarily residing in Colorado while working for Fidelity, then the following provisions apply and modify the terms of this Agreement:

**9.** **Non-Solicitation – Customers & Prospective Customers.** The provisions of Paragraph 9 shall be rewritten as follows:

"**(a)** Employee understands and acknowledges that, in order to service customers on behalf of Fidelity, Employee will be given access to and/or assist in developing trade secret information about such customers. To further protect Fidelity's trade secret information, Employee agrees that during Employee's employment and for a period of one year following Employee's separation from employment by Fidelity, Employee will not directly or indirectly, on Employee's own behalf or on behalf of anyone else or any company, solicit in any manner or induce or attempt to induce any Customer or Prospective Customer for the purpose of inviting, encouraging, or requesting any such Customer or Prospective Customer (a) to transfer accounts from Fidelity to any other person or firm that does business in any line of business in which Fidelity is engaged, (b) to sever any investment advisory relationship in favor of obtaining investment advice elsewhere, whether or not assets are transferred out of Fidelity, or (c) to otherwise discontinue or reduce the scope of the Customer's or Prospective Customer's business relationship with Fidelity. A "Customer" is any customer of Fidelity that Employee serviced or about whom Employee otherwise gained trade secret information during the twenty-four months immediately preceding Employee's separation from employment with Fidelity. A "Prospective Customer" is any individual or entity as to which Employee was personally involved in making a proposal or discussions regarding potentially becoming a customer of Fidelity, or about which Employee otherwise gained trade secret information regarding such proposals or discussions, in either case at any time during the twenty-four months immediately preceding Employee's separation from employment with Fidelity. This provision does not preclude Employee from doing business with a Customer or Prospective Customer if that Customer or Prospective Customer approaches the Employee on their own without any direct or indirect attempts by the Employee to cause that Customer or Prospective Customer to do so.

**(b)** Earnings Threshold: The restrictions in Paragraph 9 shall apply and be enforceable only if, at the time of termination of employment with Fidelity, Employee had been earning an amount of Annualized Cash Compensation equivalent to or greater than 60% of the threshold amount to qualify as a Highly Compensated Worker, as the terms Annualized Cash Compensation, Highly Compensated Worker, and Threshold Amount for Highly Compensated Workers are defined in Colorado Revised Statutes Section 8-2-113 or any equivalent Colorado statutory provision that may be in effect at the time of Employee's termination of employment with Fidelity."

**10.** **Non-Solicitation – Employees**. The provisions of Paragraph 10 shall be rewritten as follows: "Employee further agrees that during Employee's employment and for a period of one year following Employee's separation from employment by Fidelity, Employee will not, directly or indirectly, solicit any employee of Fidelity to leave Fidelity's employment. This restriction applies only to the solicitation of those employees (i) with whom Employee had direct contact for business purposes, or (ii) whom Employee knew about because of Employee's access to Fidelity's Confidential Information or trade secrets."

Page 7



**15(f). Miscellaneous. Governing Law.** In Paragraph 15(f) the phrase, "…the state to which Employee was last assigned to work by Fidelity," shall be rewritten as "the State of Colorado."

| GEORGIA |
|---|

If at the time of Employee's termination of employment with Fidelity, Employee had been primarily working for Fidelity in Georgia, then the following provision applies and modifies the terms of this Agreement:

**10.     Non-Solicitation – Employees**. In addition to the limitations on the restrictions already stated in Paragraph 10, the restriction on solicitation of employees is further limited to prohibit only solicitation of those employees of Fidelity who work in or are assigned to a Fidelity office located within the State of Georgia.

| MINNESOTA |
|---|

If at the time of Employee's termination of employment with Fidelity, Employee had been primarily working for Fidelity in Minnesota and had been primarily residing in Minnesota while working for Fidelity, then the following provisions apply and modify the terms of this Agreement:

**15(f). Miscellaneous. Governing Law.** In Paragraph 15(f) the phrase, "…the state to which Employee was last assigned to work by Fidelity," shall be rewritten as "the State of Minnesota."

| OKLAHOMA |
|---|

If at the time of Employee's termination of employment, Employee had been primarily working for Fidelity in Oklahoma or had been primarily residing in Oklahoma while working for Fidelity, then the following provisions apply and modify the terms of this Agreement:

**9.     Non-Solicitation – Customers.** The provisions of Paragraph 9 shall be rewritten as follows: "During employment and for a period of one (1) year following the termination of such employment, Employee shall not directly solicit any Customer of Fidelity to purchase goods or services, or a combination of goods and services, then sold by Fidelity from another person or entity. The term "Customer" means an established customer (individuals, companies. or business entities) with which Employee had business-related contact during the twelve (12) month period immediately preceding Employee's termination of employment with Fidelity."

**10.     Non-Solicitation – Employees**. The provisions of Paragraph 10 shall be rewritten as follows: "Employee further agrees that during Employee's employment and for a period of one year following Employee's separation from employment by Fidelity, Employee will not, directly or indirectly, actively or inactively, solicit any employee of Fidelity to become an employee of another person or business. This restriction applies only to solicitation of those employees (i) with whom Employee had direct contact for business purposes, or (ii) whom Employee knew about because of Employee's access to Fidelity's Confidential Information or trade secrets."

| WISCONSIN |
|---|

If at the time of Employee's termination of employment, Employee had been primarily working for Fidelity in Wisconsin or had been primarily residing in Wisconsin, then the following provisions apply and modify the terms of this Agreement:

**6.     Confidential Information.** The restrictions in Paragraph 6 shall be limited to a duration of 24 months following termination of Employee's employment with Fidelity. Notwithstanding the foregoing, any information qualifying as a trade secret remains confidential and may not be disclosed or used pursuant to law until such time as such information is no longer, in fact, confidential through no fault or action of Employee.

**11(c).     Injunctive Relief. Impact on Covenants.** Paragraph 11(c) is deleted and shall not apply.





# EXHIBIT F

**Enterprise Cybersecurity (ECS)**

# Corporate Information Protection Policy

Published Date: 10/22/2021
Version: 9.13
Product Area: Data Security, Detection & Response
Last Review Date: 9/13/2021
Next  Review Date: 9/13/2022

## Contents

1. Summary ............................................................................................................................... 1
   1.1 Purpose ......................................................................................................................... 1
   1.2 Scope ............................................................................................................................. 1
2. Classifying Fidelity Information .......................................................................................... 1
   2.1 Fidelity Public Information (Public) ............................................................................. 1
   2.2 Fidelity Internal Information (Internal) ....................................................................... 1
   2.3 Fidelity Confidential Information (FC) ........................................................................ 2
   2.4 Fidelity Highly Confidential Information (FHC) ......................................................... 2
   2.5 Changing Classification Levels.................................................................................... 2
   2.6 Reviewing Assigned Classifications ........................................................................... 2
3. Labeling Fidelity Information................................................................................................ 2
   3.1 Forms and Documents .................................................................................................. 2
   3.2 Websites ......................................................................................................................... 2
   3.3 Special Circumstances.................................................................................................. 3
      3.3.1 Legally Privileged Communications ................................................................... 3
      3.3.2 Information with Mixed Classifications .............................................................. 3
      3.3.3 Unlabeled Information .......................................................................................... 3
      3.3.4 No Label Required ................................................................................................ 3
      3.3.5 Out of Scope Information ...................................................................................... 3
4. Handling Fidelity Information............................................................................................... 3
   4.1 Avoid Accidental Information Disclosure ................................................................... 3
   4.2 Protect Information on Electronic Media and Portable Devices ............................... 4
   4.3 Store Information Securely............................................................................................ 5
      4.3.1 Confidential and Highly Confidential Information Only ................................... 5
      4.3.2 Additional Precautions When Working Outside the Office .............................. 5
   4.4 Encrypt Fidelity Information ......................................................................................... 5
      4.4.1 Encryption Guidelines for Confidential and Highly Confidential Information........ 5
      4.4.2 Encryption Guidelines for Cloud (IaaS/PaaS/CaaS) Information ................... 5
   4.5 Report Known or Suspected Information Loss or Disclosure ................................... 6
   4.6 Protect Personal Information ........................................................................................ 6
   4.7 Secure Physical Devices Outside the Office.............................................................. 6
      4.7.1 Hotel Rooms ......................................................................................................... 6
      4.7.2 While Traveling..................................................................................................... 6
      4.7.3 Personal Workspaces .......................................................................................... 6
5. Disposing of Fidelity Information ........................................................................................ 6
6. Vendor Use of Personal Information.................................................................................... 7
7. Information Protection Roles and Responsibilities ........................................................... 7
   7.1 Managers ........................................................................................................................ 7
   7.2 Information Security Officers (ISOs) ............................................................................ 7
   7.3 Information Owners ....................................................................................................... 7
8. Associated Content & References ....................................................................................... 7
9. Contacts ................................................................................................................................. 7

# 1. Summary

## 1.1 Purpose

You are responsible for classifying and labeling the Fidelity information you use or encounter. Proper information classification, labeling, and handling are integral to Fidelity's business. By following this policy, you help protect Fidelity from legal and financial liability as well as regulatory and reputational risk.

Assigning the right classification is essential. A too-low classification puts sensitive information at risk. A too-high classification, while generally less damaging, can still be harmful since it restricts access and forces you and others to take excessive security precautions. If you think something is classified incorrectly, notify the person or office from whom you received the information.

Applying this policy requires both knowledge and judgment on your part. In some cases, it may be appropriate to assign a higher classification than a document would otherwise receive.

Fidelity Enterprise Cybersecurity (ECS) policy is intended to protect the firm in an evolving threat landscape, regardless of changes in technology or business practices. Even if specific terminology or scenarios are not part of the text, it is expected that you will exercise sound reasoning and judgment to adhere to the intent of stated requirements, practices, and implementations in both letter and spirit.

Your business unit (BU) may have additional requirements concerning information security. Understanding and following them is your responsibility. Ask your manager or your BU's Information Security Officer (ISO). Some non-U.S. companies may have their own versions of this policy; be aware of potential policy differences when working with companies in other countries.

## 1.2 Scope

This policy applies to the Fidelity workforce as defined in the Employee Classifications Definition (U.S.) document.

# 2. Classifying Fidelity Information

You are responsible for making sure that Fidelity Information is accurately labeled with the correct classification. Even if a document is already labeled, make sure the classification is correct. Fidelity information must be assigned one of the four classifications described below. Classification levels are based on risks to business operations and business reputation and the potential for financial loss to Fidelity, associates, and customers. For examples of each classification, see the Information Protection Policy Quick Reference.

## 2.1 Fidelity Public Information (Public)

Public information is intended for general circulation inside and outside Fidelity. Public circulation of the information would not expose Fidelity to any reputational risk, financial loss, or competitive disadvantage.

Items classified as Public do not require a label (although they can be labeled if desired) and they do not require any special handling. You must get approval before classifying any information as Public.

- For marketing materials and items distributed to customers, use the process approved for your BU (e.g., eReview)
- For presentations, publications, and speeches, consult the External Communications Policy
- For other items, contact Fidelity Legal

## 2.2 Fidelity Internal Information (Internal)

Fidelity internal information is intended for relatively unrestricted circulation inside Fidelity during the normal course of business, including, as appropriate, consultants, vendors, or temporary

workers.

Unauthorized access, disclosure, use, or tampering could have a minor adverse effect on the confidentiality or integrity of the information, or could otherwise cause minor impact to Fidelity, Fidelity associates or customers.

Within the Internal Information category, computer source code may require more protective measures than other types of information. See Protection of Source Code in the Secure Software Development Lifecycle Standard.

## 2.3 Fidelity Confidential Information (FC)

Fidelity confidential information is intended for individuals and groups with a business need to know. Unauthorized access, disclosure, use, or tampering could have a moderate adverse effect on information confidentiality or integrity, or could otherwise moderately impact Fidelity, our associates, or our customers.

## 2.4 Fidelity Highly Confidential Information (FHC)

Fidelity highly confidential information is data that, if compromised, may have a severe impact on Fidelity, its customers, vendors, or employees. Unauthorized access, disclosure, use, or tampering could have a severe adverse effect on information confidentiality or integrity or could otherwise severely impact Fidelity, our associates, or our customers.

Within the Highly Confidential category, some types of information require more protective measures than others.

## 2.5 Changing Classification Levels

Sometimes information needs to be reclassified. For example, a product announcement might be Highly Confidential while in development, but Public once it is released. Make sure the information owner approves any reduction in classification level. Anything classified as Public requires necessary approvals described in this policy.

## 2.6 Reviewing Assigned Classifications

Information owners should periodically review the risk classifications of resources for which they are responsible, to ensure that the assigned classification levels are still appropriate.

# 3. Labeling Fidelity Information

Label Fidelity information under your control. Use the full label text for the classification:
- Fidelity Internal Information
- Fidelity Confidential Information
- Fidelity Highly Confidential Information

If you are in doubt as to the correct label text, contact your ISO. Except as noted, Fidelity information must be clearly labeled with its classification, as follows:

## 3.1 Forms and Documents

These requirements apply to both hardcopy and electronic formats:
- Frequency: every page or slide, including cover/title page
- Preferred location: header or footer
- Forms are labeled according to the contents included in the completed form.

## 3.2 Websites

- Frequency: every page, including home page
- Preferred location: header or footer

### 3.3 Special Circumstances

### 3.3.1 Legally Privileged Communications

Any print and electronic materials with information that may be protected by attorney-client privilege must be labeled "Attorney-Client Communication" in addition to the classification label.

### 3.3.2 Information with Mixed Classifications

When information of different classifications is combined, the resulting materials must be classified and handled according to the most restrictive classification.

### 3.3.3 Unlabeled Information

If you encounter Fidelity information that appears to require a classification label but does not have one, add the correct label or contact the information owner and request them to do so.[1]

### 3.3.4 No Label Required

No label is required on the following:

- Materials approved for classification as Public
- Materials intended for end customer use (such as account statements)
- Participant reports and other client data requested by clients or intended for their use; however, alternative labeling may be required if a client has requested it
- Materials received from end customers
- Vendor or other third-party information already labeled by the vendor or other source
- Information stored or handled by legacy applications and systems that lack the capacity for labeling
- Non-business information

### 3.3.5 Out of Scope Information

Information that does not concern Fidelity business in any way (e.g., an email to a family member about childcare arrangements) is considered non-Fidelity information and falls outside the scope of this policy.

## 4. Handling Fidelity Information

Proper handling depends on the information's classification and labeling. The following rules outline both general and specific methods for using, storing, transmitting, and reproducing information. Rules in this section that apply only to Confidential and Highly Confidential Information are identified as such.

### 4.1 Avoid Accidental Information Disclosure

With every Fidelity information classification other than Public, follow these precautions:

- Keep discussions behind closed doors when possible. Use caution when discussing information in public places such as restaurants or elevators.
- Be aware of who or what is within earshot. Unauthorized listeners or devices (e.g., Amazon Echo, Google Home, and cell phones) may be present at any given time, even in an office environment.
- Erase whiteboards when leaving conference rooms or open spaces.
- Limit distribution to those who need to know. Keep access and distribution to the smallest set of recipients possible without eliminating necessary or appropriate recipients. Review addressees (both on email and physical mail) prior to distributing information. The more sensitive the information, the more restricted the distribution list should be.

---

[1] Any Fidelity company that is not known to a customer as "Fidelity" (e.g., Devonshire Investors – Diversified Investments) may substitute its company name in place of Fidelity in the label.

- Outside Fidelity, share information with qualified parties only. Do not share information with vendors or other external parties unless you are sure that they already have an established relationship with Fidelity and are subject to a non-disclosure agreement (NDA) or are otherwise restricted from disclosing the information to others. An NDA is required[2] if sharing data for contract negotiation purposes, proof of concept demonstrations based on a request for proposal (RFP), source code sharing for pilot projects, and pre-contract due diligence reviews. If a vendor will have access to personal information, make sure that a Fidelity Vendor Technology Risk (VTR) assessment has been performed and that the vendor has a contract (not just an NDA) in place with appropriate confidentiality and data security obligations. See the Vendor Privacy Oversight Policy.
- Never share passwords and never store passwords (on paper or electronically) where someone could find and use them.
- Be careful when printing or copying. Use one of the following:
  - Internal printer
  - Approved print service (internal or external)
  - Personally, supervise printing on other printers (such as at home or while traveling)

Do not let sensitive information lie unattended in fax machines, printers, or copier trays and don't forget to take your originals with you. Securely dispose of any unwanted copies.

Do not print Highly Confidential information unless you have a business need and are authorized to do so.

Note: Incidental and occasional use of Fidelity resources to print your own personal information, such as tax statements or performance reviews, is acceptable.

Do not leave Fidelity Information, including Confidential or Highly Confidential Information, unsecured in your workspace. This includes your assigned desk, unassigned desk, common/shared areas, and conference rooms.

Do not photograph or make video recordings of Confidential or Highly Confidential information displayed on computer screens.

## 4.2 Protect Information on Electronic Media and Portable Devices

Employees who use electronic media (such as CDs and USB devices) or portable electronic devices (such as laptops and PDAs) are responsible for the security of the Confidential and Highly Confidential Information contained on them. Because it can be difficult to know whether electronic media or devices contain such Information, always treat electronic media and devices as if they contain Highly Confidential Information. Make these steps part of your routine:

- Keep electronic media on your person or in sight while traveling or any other time they cannot be physically secured.
- Secure electronic media in a locked drawer or locked office when they are not in your immediate possession.

---

[2] The requirement regarding being bound by an NDA, contract, or other obligation of confidentiality may not apply in certain cases:

(a) if Fidelity is legally obligated to provide non-public Fidelity information to an external party –in these situations, consult with Legal

(b) for Corporate Policies and similar non-public Fidelity information, if reasonable assurance exists that the recipient will restrict distribution to those with a business–related or legal "need to know" (e.g., applicable corporate policies may be provided in response to a request from a former employee, or requests from or proposals to business partners, clients, or prospects). Contact HR Solutions/Employee Relations at (800) 835-5099, Option 2 for questions on external party access to Corporate Policies. Contact Procurement for NDAs and questions on external party access for business purposes at http://spendsmart.fmr.com

- Secure laptops outside Fidelity facilities.

Related requirements for Fidelity mobile devices are detailed in the Electronic Communications, Social Media, and Systems Usage Policy.

## 4.3 Store Information Securely

### 4.3.1 Confidential and Highly Confidential Information Only

For Confidential and Highly Confidential Information, store hard copies in a locked office, filing cabinet, or other facility accessible only to authorized individuals. Information on websites, file servers, or approved document repository services (e.g., SharePoint) must be protected by access controls.

Highly Confidential Information must remain within Fidelity premises unless there is a specific business reason for it to circulate or be transported outside Fidelity.

### 4.3.2 Additional Precautions When Working Outside the Office

When working at home or at another remote location, safeguard Fidelity media as carefully as you would in the office or when traveling. Make sure no one else in your location can access Fidelity information. Use security controls outlined in the Flexible Work Options Policy for guidance. Save non-public Fidelity information only to approved media, devices and systems in accordance with the Electronic Communications, Social Media, and Systems Usage Policy.

Local Administrator rights on Fidelity devices and systems are restricted to reduce the likelihood of introducing viruses or malware into the Fidelity network. Downloading software and adding printers or other peripheral devices outside the office must be coordinated with Techworks or a local IT contact.

## 4.4 Encrypt Fidelity Information

Refer to the encryption information on the Email Security page or consult with your BU's ISO for current supported email and file encryption tools. For system-to-system communications, data storage, and password administration, system administrators should consult applicable ECS policy on the ECS Policy Website.

### 4.4.1 Encryption Guidelines for Confidential and Highly Confidential Information

Where BUs have determined a technology solution to be effective and acceptable to external entities with which Fidelity information is shared, use encryption for:

- PINs and passwords that are being transmitted or stored
- Confidential or Highly Confidential Information stored on removable media
- Any transmission, including email, of Confidential or Highly Confidential Information outside the Fidelity network
- Fidelity employee compensation and performance data that is being emailed, whether within Fidelity or externally

You must use only Fidelity-approved encryption methods. To select an appropriate encryption method, see the Encryption Standard.

### 4.4.2 Encryption Guidelines for Cloud (IaaS/PaaS/CaaS) Information

Where BUs have determined an IaaS/PaaS/CaaS solution to be effective and acceptable for external entities with which Fidelity information is shared, comply with the following encryption requirements:

- Data-in-transit – Encrypt at all times in the IaaS/PaaS/CaaS using Fidelity-managed or approved third-party-issued certificates (e.g., Akamai or Entrust)
- Data-at-rest – Encrypt at all times in the IaaS/PaaS/CaaS using Fidelity-managed keys
- BU's must work within defined encryption guardrails for certified services depending on the data classification. Data protection requirements for each service can be found in the configuration guide for that service.

Where IaaS/PaaS/CaaS encryption services provided are not adequate, BU's must use client-side encryption.

## 4.5 Report Known or Suspected Information Loss or Disclosure

Notify your ISO or Corporate Security of any known or suspected information loss or disclosure. This includes cases of access by unauthorized parties as well as circumstances that might have allowed such access (e.g., sending an unencrypted email containing Confidential or Highly Confidential Information). Report incidents immediately.

## 4.6 Protect Personal Information

The Fidelity workforce has a duty to protect personal information. For this policy, personal information is considered Highly Confidential. This includes lists containing customer information. Exceptions to some handling requirements for personal information may be warranted by context or circumstance. Consult with the information owner, your manager, and ISO for guidance regarding appropriate handling, disposal, and other controls. Use sound judgment and assess risk when working with personal information.

Some employee personal information, such as business contact information and employee photos, is considered Internal. To find out which employee personal information is considered Internal Information, see the Employee Personal Information Privacy Notice & Policy.

Additional legal requirements may apply to personal information transmitted to or from other countries or global regions (such as the European Union). Check with Compliance or Fidelity Legal.

For logging and masking personal information before use in a test environment, see the Database Standard and Secure Software Development Lifecycle Standard.

## 4.7 Secure Physical Devices Outside the Office

### 4.7.1 Hotel Rooms

When travel includes a hotel stay, Fidelity associates must take reasonable precautions to prevent theft or loss, such as cable-locking devices or storing them in room safes.

### 4.7.2 While Traveling

Fidelity associates must take reasonable precautions to prevent theft or loss of devices and data while traveling:

- Keep laptops or devices securely in hand or within sight when they cannot be physically secured.
- Do not check mobile devices as luggage unless directed to do so by the airline and/or as a result of a government directive. If not required to check an item, it should remain in your possession as hand luggage.
- If you are not allowed to keep the device in your possession, power it off before checking it through to your destination.
- If you must leave a laptop or device in a vehicle, shield the device from view (e.g., stow it in the trunk) and lock the vehicle.

### 4.7.3 Personal Workspaces

Access to Fidelity-owned devices at your home office or other personal workspace must be limited to yourself. Family members, friends, and other non-Fidelity personnel are not allowed to use your Fidelity devices.

# 5. Disposing of Fidelity Information

Fidelity information must be disposed of at the right time and in the right way with the following in mind:

- Applicable record retention requirements

- Whether the information is subject to a legal hold (documents subject to a legal hold must not be altered or destroyed)
- Classification
- Type of media or device involved
- BU-specific processes

For more about disposal practices at Fidelity, see the Information and Device Disposal Standard.

## 6. Vendor Use of Personal Information

To determine whether Personal Information can be shared with a vendor, please review the Vendor Privacy Oversight Policy.

## 7. Information Protection Roles and Responsibilities

### 7.1 Managers

Managers communicate, support, and help enforce the policy. Managers are responsible for understanding this policy and helping communicate and enforce its terms. Managers should contact HR Solutions (or their local equivalent) to determine how best to address violations.

Managers take responsibility for proper information handling by departing employees. When an employee terminates, transfers, or relocates, their manager ensures that the employee disposes of documents and materials in accordance with this policy. Any tasks left undone by the departing employee are the manager's responsibility to rectify.

### 7.2 Information Security Officers (ISOs)

ISOs interpret and administer the policy at the BU level. They are responsible for translating policy into specific controls that are appropriate and effective for their respective BU's.

ISOs are responsible for helping their assigned BU implement enterprise security programs related to this policy. They are also expected to guide and assist individual employees with policy understanding and compliance.

### 7.3 Information Owners

Information owners periodically review data classifications. Information and application owners periodically review risk classifications of resources for which they are responsible to ensure appropriateness of the assigned classification level.

Information owners may delegate their responsibilities; however, accountability remains with the information owner. Information owner responsibilities include:

- Mandating information security policy and control implementation
- Authorizing and periodically reviewing access entitlements
- Ensuring resolution of information security-related audit issues
- Delegating authority as required within their business area to complete tasks
- Periodically reviewing information classifications of resources under their control
- Maintaining an inventory of information resources (e.g., data, hardware, software) under their control

## 8. Associated Content & References

Training Questions – Visit the Enterprise Cybersecurity Training (fmrcloud.com) website

## 9. Contacts

Please contact your ISO with any questions related to this policy.

# EXHIBIT G

# Information Protection Policy Quick Reference

## Classify and Label

| CLASSIFICATION | | | |
|---|---|---|---|
| **Fidelity Public**<br>Public information is intended for general circulation.[1] Explicit approval is needed before assigning this classification. | **Fidelity Internal**<br>Information intended for relatively unrestricted circulation within the Fidelity Workforce. | **Fidelity Confidential**<br>Information *not* intended for unrestricted circulation within the Fidelity Workforce. | **Fidelity Highly Confidential (HC)**<br>High-risk information that requires strict controls. |
| Label Optional | Label Required | Label Required | Label Required |
| Examples include:<br>• Articles in the press<br>• Brochures, published marketing materials<br>• Code contributed to Open Source<br>• Press releases<br>• Public websites<br>• Published annual reports<br>• Published fund prospectuses<br>• Regulatory and legal filings<br>• Released patents<br>• Stock quotes | Examples include:<br>• Basic emergency response plans<br>• Employee contact information (e.g., name or email)<br>• Employee web/intranet portals<br>• *Fidelity Central* and internal newsletters<br>• Fidelity policies and procedures<br>• Fidelity training materials<br>• Organization charts | Examples include:<br>• Account numbers<br>• Audit reports<br>• Budget information and non-public financial statements<br>• Business strategies and plans<br>• Customer employee ID<br>• External IP addresses<br>• Grant information<br>• Most Fidelity source code<br>• Non-public legal work/litigation info<br>• Non-security technical specifications/architectures<br>• Plan/client data<br>• Pre-release marketing materials<br>• Purchasing/bid information<br>• Security findings or reports (e.g., SOC-1)<br>• Systematically generated IDs when used alone (e.g., Universal (UID), Member (MID) and Workplace (WID) IDs)<br>• Unreleased fund holdings/trades | Examples include:<br>• Board meeting materials & reports<br>• Compensation data<br>• Credit card numbers<br>• Customer Personal Information that can identify an individual (e.g., name used in conjunction with external IP address, email, phone or account no., UIDs, MIDs, or WIDs)<br>• Highly sensitive legal work<br>• Passwords and PINs<br>• Performance reviews<br>• Private encryption keys<br>• Proposed acquisitions, ventures, and divestitures<br>• Protected Health Information (PHI)<br>• Health Sensitive Data (HSD)<br>• Reports of significant exposures, risk assessments, and pen test results<br>• Security system architectures and procedures<br>• Social security numbers<br>• System credentials<br>• Trade secrets |

[1] Note that Public Information may have a different classification prior to its release.

**Know the policy -** Read the Information Protection Policy

**Seek guidance -** If you have questions or concerns about information protection or if you know of items that are out of compliance, please contact your manager or your business unit's ISO

**Use sound judgment -** The lists above are examples, not definitive classifications. Items containing customer data, security information, prelaunch new product details, or similar sensitive information should be classified as Fidelity Highly Confidential

## Handle and Dispose

| | Classification | | | | | | |
|---|---|---|---|---|---|---|---|
| | **Public** | **Fidelity Internal** | **Fidelity Confidential** | **Fidelity Highly Confidential** | | | |
| | | | | **All Other HC** | **Personal Information**[1] | **Employee Comp. & Performance** | **PINs/ Passwords** |
| **Handle** | | | | | | | |
| Get approval before assigning this classification | R | N/A | N/A | N/A | N/A | N/A | N/A |
| Do not share outside Fidelity (e.g., with vendors or contractors) except on a need-to-know basis and when the recipient is restricted from disclosing the information to others | N/A | R | R | R | R | R | R |
| Use caution when discussing in public | N/A | R | R | R | R | R | R |
| Report possible or actual loss immediately to the ISO or Corporate Security | N/A | R | R | R | R | R | R |
| Encrypt when sending or transporting outside Fidelity | N/A | ✓ | R | R | R | R | R |
| Encrypt when emailing inside Fidelity | N/A | ✓ | BP | BP | BP | R | R |
| Share only on a need-to-know basis inside Fidelity | N/A | BP | R | R | R | R | ✖ |
| Do not leave unsecured copies on copiers/printers or in any workspace, including offices, assigned/unassigned desks, common/shared areas, and conference rooms | N/A | BP | R | R | R | R | R |
| Limit access on internal websites and systems (PINs and passwords are never available) | N/A | BP | R | R | R | R | N/A |
| Obtain specific permission and have a specific business requirement before removing info with this classification from Fidelity premises | N/A | BP | BP | R | R | R | N/A |
| Never share with anyone, and never carry with the related device | N/A | N/A | N/A | N/A | N/A | N/A | R |
| **Dispose** | | | | | | | |
| Place in deskside/shared recycling (paper only) | ✓ | ✓ | ✓ | ✖ | ✖ | ✖ | ✖ |
| Personally shred (paper only) or place in locked Fidelity recycling container (paper) or turn in to local Security Office (removable media) | ✓ | ✓ | ✓ | R | R | R | R |

[1]See the Information Protection Policy for a complete description of Personal Information.

| Key | | |
|---|---|---|
| | Required | R |
| | Best Practice | BP |
| | Permitted | ✓ |
| | Prohibited | ✖ |
| | Not Applicable | N/A |

Case 8:26-cv-01978   Document 1   Filed 07/10/26   Page 65 of 78 PageID 65

# EXHIBIT H

**Fidelity** INVESTMENTS®

Meredith A. Faro
Attorney

FMR LLC Legal Department

155 Seaport Blvd, ZW8B, Boston, MA 02210
Phone: 617-392-8136  Fax: (617) 850-8335
meredith.faro@fmr.com

MAILING ADDRESS:
FMR LLC Legal Department
88 Black Falcon Ave.
Suite 167
Boston, MA 02210

April 21, 2026

## Via Overnight Delivery

Ernest Meads
875 6th Avenue South
St. Petersburg, FL 33701

Dear Ernest:

It has come to our attention that after you left your position as Financial Consultant in Fidelity Brokerage Services LLC's Clearwater, FL Branch, you accepted a position with Darwin Wealth Management.

Fidelity has reason to believe that you may be contacting Fidelity customers for the purpose of soliciting their business. The Employee Agreement ("the Agreement") you signed while in Fidelity's employ (copy attached) prohibits such solicitation of Fidelity's customers. This letter constitutes a formal demand that any such activity cease immediately. Furthermore, all of Fidelity's customer and prospect lists, and all information concerning Fidelity's customers, including names, addresses, telephone numbers, email addresses and account information, are confidential and proprietary. Pursuant to the Agreement and general principles of law, you are obligated to maintain all of Fidelity's confidential and proprietary information in strictest confidence. This includes information that you have in your memory. You may not disclose this information or make any use of it for yourself or for others, including your present or future employers.

Please return to Fidelity any confidential or proprietary information belonging to Fidelity in your possession, such as records, electronic data, computer files, lists, screen prints, or computer discs pertaining to Fidelity clients or individuals or entities you became aware of through your employment at Fidelity, including but not limited to names, phone numbers, addresses and/or email addresses, whether in original, copied, computerized, handwritten or any other form. To the extent these exist in electronic form, you must not delete it or alter it in any way, but instead must refrain from using it, accessing it or transferring it to anyone, and you must contact us or have your counsel contact us to coordinate its preservation as evidence, and its return to us, in a forensically sound manner. It is important to understand that deleting or altering such electronically stored information without taking forensically sound steps to preserve it will be viewed as intentional destruction of evidence, and there can be serious sanctions that result from such destruction. Please verify that you have complied in full as set forth above by signing the enclosed affidavit and returning it to me by **April 28, 2026**.

Also, as a condition of your employment with Fidelity, you were obligated to comply with Fidelity's Compliance Policy for Electronic Communications, Social Media and Systems Usage (the "Social Media Policy"). Pursuant to the Social Media Policy, you were strictly required to

Ernest Meads
Page 2

disconnect with any Fidelity clients you were connected with on LinkedIn or any other similar networking platforms immediately upon separation from Fidelity. If you have violated this policy by maintaining connections with any Fidelity clients on LinkedIn or other networking platforms, then Fidelity demands that you delete any such connections and refrain from (a) initiating any communications with such client(s) through LinkedIn or any other similar platform's messaging function, and (b) updating your place of employment in a manner that will result in a notification being pushed out to such client(s), or which will be captured by a routine periodic push of updates to such client(s) through regular operation of LinkedIn or other platforms' systems. If you have updated your information since resigning or otherwise engaged in contact or communication with Fidelity clients via LinkedIn or other similar platforms, then you must take steps to preserve evidence prior to any deletion, consistent with the instructions set forth above.

Please be advised that if Fidelity does not hear from you by **April 28, 2026**, the company will pursue all necessary and appropriate remedies that it may have against you, which may include seeking monetary damages, injunctive relief, and/or its attorneys' fees and costs.

I am also sending a copy of this letter to Spencer Avalos, Managing Director of Wealth Management at Darwin Wealth Management, who we assume may want to take steps to ensure that you are not put in a situation that would require or allow you to breach the terms of the Agreement or your other obligations to Fidelity.

Further, you are hereby given notice of your obligation to preserve evidence that you know, or should know, may be relevant to any potential lawsuit regarding the matters set forth in this letter. You should not destroy, conceal, or alter any evidence related to any claims or defenses regarding this matter, including without limitation any evidence in paper or electronic files, or other data generated by and/or stored on any smart phones or computers, including home computers and laptops, or contained in email, text message, or voicemail.

If you have any questions, please let me know.

Very truly yours,

Meredith A. Faro

Enclosures

cc:

Spencer Avalos
Darwin Wealth Management
W North A Street
Tampa, FL 33609-1909

## AFFIDAVIT OF ERNEST MEADS

Ernest Meads, being first duly sworn, states as follows:

1.      My name is Ernest Meads and I am over the age of 18.  Except where otherwise indicated, the statements contained herein are based on my personal knowledge.  I was employed by Fidelity Brokerage Services LLC ("Fidelity") until my employment ended effective April 5, 2026.

2.      I hereby state that I do not have in my possession, custody or control customer lists (including any Christmas or holiday card or gift mailing lists), records, electronic data, computer files, or documents pertaining to Fidelity clients or prospective clients I worked with or  became aware of through my employment at Fidelity, including but not limited to names, phone numbers, addresses and/or e-mail addresses, whether in original, copied, computerized, handwritten, photographed, maintained on an iPhone or iPad or other personal device, or any other form.  This includes any documents created either during or after I left my employment with Fidelity that contain information pertaining to Fidelity clients or prospective clients that I worked with or became aware of through my employment at Fidelity, including information recreated through the use of memory, or by using information in memory to recreate information from public sources.  To the extent I had any such information in hard copy, I have returned the hard copy documents to Meredith Faro, along with this affidavit.  To the extent I had any such information in an electronically stored format, I or my counsel has engaged with Fidelity's counsel to arrange for forensically sound preservation, prior to removal, return to Fidelity and deletion from my possession, of any such electronically stored information.

3.      I have not given any of the above documents or information or copies thereof to any other person or entity.

4.      I have deleted all connections with any Fidelity clients made during my employment at Fidelity on LinkedIn and other networking platforms, and will refrain from (a) initiating any communications with such client(s) through LinkedIn or any other similar platform's messaging function, and (b) updating my place of employment in a manner that will result in a notification being pushed out to such client(s), or which will be captured by a routine periodic push of updates to such client(s) through regular operation of LinkedIn or other platforms' systems.

Pursuant to 28 USC §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on _____, 2026        _____

                                            Ernest Meads



Sworn to and subscribed before me
this ____ day of _____, 2026




_____
Notary Public

# Employee Agreement

Ernie Meads

("Employee") wishes to be employed by FMR LLC and/or any entity that is directly or indirectly, wholly or in part, owned or controlled by or under common control with FMR LLC (the "Fidelity Companies"). As a condition of employment, Employee and the Fidelity Companies agree to abide by this Agreement. This Agreement describes certain aspects of Employee's employment, protects Confidential Information and goodwill of the Fidelity Companies, and assists the Fidelity Companies in complying with their legal, regulatory, and other obligations.

1. **Confidential Information.** To assist Employee in the performance of his/her duties, the Fidelity Companies agree to provide to Employee training and/or education regarding the Fidelity Companies' business methods, and agree to provide to Employee access to certain Confidential Information belonging to the Fidelity Companies. Confidential Information consists of all information pertaining to the business of any of the Fidelity Companies that is not generally known to the public at the time made known to Employee. It includes but is not limited to trade secrets; secret, confidential, and proprietary information; information protected by the attorney-client privilege; marketing, financial, research, trading, portfolio, and sales information; computer passwords and program designs; proprietary computer software designs and hardware configurations; proprietary technology; new product and service ideas; business, pricing, and marketing plans; customer, prospect, vendor, and personnel lists; financial and other personal information regarding customers and employees; confidential information about other companies and their products; and information expressly designated as "Fidelity Highly Confidential," "Fidelity Confidential," or "Fidelity Internal." All Confidential Information is imparted to Employee in a relationship of confidence. As a condition and in consideration of the Fidelity Companies' agreement to provide Employee with training and/or education and Confidential Information, Employee agrees that during his/her employment and thereafter, Employee will not copy, reproduce, use, disclose, or discuss in any manner, in whole or in part, any Confidential Information unless (1) necessary for Employee to carry out his/her job; (2) necessary for employees or other agents of the Fidelity Companies to carry out their duties and responsibilities; or (3) authorized in writing by the Fidelity Companies. Employee also will not retain any copies, notes, or excerpts of Confidential Information upon termination of his/her employment. Employee will promptly notify the Fidelity Companies of any inadvertent, unauthorized, or negligent copying, reproduction, use, disclosure, or discussion of Confidential Information. Employee will not open, read, or in any way access Confidential Information without authorization. The foregoing requirements are subject to the limitations set forth in paragraph 10, below.

2. **Systems Access.** In order to carry out his/her responsibilities, Employee may be given access to various computer systems and passwords, user identifications, or other authenticating information ("password(s)"). Employee will not disclose his/her password(s) to anyone except in accordance with Fidelity policy. While incidental personal use of systems may occur, this is not the purpose of providing access; rather, all systems generally are to be used for legitimate Fidelity business purposes only, and all items created, accessed, or stored will be treated as Fidelity property for all purposes, including but not limited to monitoring, access, recording, review, and disclosure by Fidelity. Employee will adhere to all software licensing or other agreements applicable to systems and to Fidelity's expectations and policies regarding systems usage. Employee's authorization to access Fidelity systems shall expire when Employee leaves Fidelity's employ.



3. **Notice of Electronic Monitoring.**  Any and all telephone conversations or transmissions, electronic mail or transmissions, or internet access or usage by an employee by or using any Fidelity-provided electronic device or system, including but not limited to the use of a Fidelity computer, telephone, wire, radio or electromagnetic, photoelectronic or photo-optical systems (including any of the foregoing provided by you or by any third party that accesses Fidelity's systems) may be subject to monitoring at any and all times and by any lawful means.

4. **Company Property.** Upon termination of Employee's employment, in the event Employee's employment no longer requires access to Confidential Information, or at any earlier time as requested by the Fidelity Companies, Employee will return all company property, including but not limited to his/her identification badge, company credit cards, company-owned equipment (such as cellular telephones, beepers, and laptop computers), and all documents and materials received from or created for or by any of the Fidelity Companies, including but not limited to Confidential Information.

5. **Outside Business Activities.** So long as Employee is employed by the Fidelity Companies, Employee will not engage in any other employment or business activities unless Employee receives prior written approval from the Fidelity Companies in accordance with applicable policies and procedures. Approval for outside activities may be withdrawn at any time.

6. **Ethics and Outside Brokerage Accounts.** So long as Employee is employed by the Fidelity Companies, Employee will adhere to the Code of Ethics for Personal Investing and the Statement of Policies and Procedures on Insider Trading and all other policies, procedures, or guidelines regarding Fidelity's standards for the proper conduct of business. If Employee is an employee of or associated with a registered broker-dealer or registered with the New York Stock Exchange or the Financial Industry Regulatory Authority, Employee will comply with industry agreements, standards, and regulations, and all special policies, compliance standards, and guidelines of the Fidelity Companies applicable to those in regulated businesses. Neither Employee nor Employee's spouse will maintain any brokerage account that either Employee or Employee's spouse owns or in which either Employee or Employee's spouse has a beneficial interest through any non-Fidelity broker-dealer unless Employee receives prior written approval from the Fidelity Companies in accordance with applicable policies and procedures. Approval for an outside account may be withdrawn at any time.

7. **Non-solicitation.** In consideration of the training and/or education and access to Confidential Information provided by the Fidelity Companies, and so as to enforce Employee's agreement regarding such Confidential Information, Employee agrees that during his/her employment and for a period of one year following his/her separation from employment by the Fidelity Companies, Employee will not use any Confidential Information belonging to the Fidelity Companies to directly or indirectly, on his/her own behalf or on behalf of anyone else or any company, solicit in any manner or induce or attempt to induce any customer or prospective customer of the Fidelity Companies to divert or take away all or any portion of his/her/its business from the Fidelity Companies or otherwise cease the relationship with the Fidelity Companies. During this same period, Employee will not directly or indirectly, on his/her own behalf or on behalf of anyone else or any company, solicit in any manner or induce or attempt to induce any customer or prospective customer with whom Employee had personal contact or about whom Employee otherwise learned during the course of Employee's employment with the Fidelity Companies. Employee also will not, directly or indirectly, on his/her own behalf or on behalf of anyone or any company, hire in any manner, or induce or attempt to induce any employee of any of the Fidelity Companies leave his/her employment.

7. **Inventions and Use of Name or Likeness.** Employee will disclose and Employee hereby assigns to Fidelity as Fidelity's exclusive property all ideas, writings, inventions, products, methods, techniques, discoveries, improvements, and technical or business innovations (the "Inventions") that Employee makes or conceives, whether or not patentable or copyrightable, either solely or jointly with others, during the period of his/her employment. All written or computer coded materials manifested in documents, systems design, disks, tapes, drawings, reports, specifications, data, memoranda, or otherwise (the "Materials") made or conceived during Employee's employment shall be considered works made for hire, and all right, title, and interest in the Materials shall be owned by the Fidelity Companies. To the extent that the Materials may be held not to be works made for hire, Employee hereby assigns the sole right, title, and interest in the Materials to the Fidelity Companies. In addition, Employee will execute all necessary paperwork and provide all other reasonable assistance requested by any of the Fidelity Companies, either during his/her employment or thereafter, to enable the Fidelity Companies to obtain, maintain, or enforce in itself or its nominees, patents, copyrights, trademarks, or other legal protection on the Inventions in any and all countries. These provisions with respect to Inventions and Materials apply only to Inventions and Materials which (i) are along the lines of the business or work of any of the Fidelity Companies; (ii) result from or are suggested by any work which Employee does for the Fidelity Companies; (iii) are made or conceived using equipment or other materials of the Fidelity Companies; or (iv) are made or conceived during regular hours of work. These provisions do not apply to any invention that qualifies fully under the terms of California Labor Code Section 2870. In addition, Employee hereby authorizes the Fidelity Companies to use, publish, and copyright all or part of his/her name, voice, picture, portrait, and likeness as the Fidelity Companies may decide in their sole discretion, in all media and types of advertising for any product or service or for any other lawful purpose, without review by Employee.

8. **Agreements with Others.** Employee represents and warrants that his/her employment by the Fidelity Companies will not require Employee to violate any agreement Employee may have with any employer or other business, and that Employee will not engage in any activities in violation of any such agreement. Without limiting the foregoing, Employee will not use or disclose to the Fidelity Companies any confidential information belonging to others. Employee further represents and warrants that Employee is not a party to any agreement, and Employee owes no duty to anyone, that limits or affects his/her ability to perform his/her duties for the Fidelity Companies. Employee agrees to disclose to the Fidelity Companies, and provide copies to the Fidelity Companies if copies are available, all confidentiality, inventions, non-solicitation, non-compete, or other restrictive agreements to which Employee is or has been a party.

9. **At Will Employment.** Employee's employment by the Fidelity Companies is at will and may be terminated by Employee or by the Fidelity Companies at any time and for any reason, with or without cause or notice, during or after any applicable initial evaluation period.



10. **Communication with Government Entities.** Nothing in this Agreement shall prohibit or restrict you from (A) communicating directly with, cooperating with, providing or causing to be provided information to, or otherwise assisting in an investigation by the Securities and Exchange Commission, FINRA, the Equal Employment Opportunity Commission, the Department of Justice, or any other government or regulatory agency, entity, or official or self-regulatory organization (collectively, "Government Authority") regarding a possible violation of any law, rule, or regulation; or (B) responding to any inquiry or legal process directed to you individually (and not directed to the Company and/or its subsidiaries) from any such Government Authority, including an inquiry about the existence of this Agreement or its underlying facts or circumstances. Nor does this Agreement require you to obtain prior authorization from the Company before engaging in any conduct described in this paragraph, or to notify the Company that you have engaged in any such conduct. However, in connection with any such activity, you acknowledge that you will take reasonable precautions to ensure that confidential information disclosed to any Government Authority is not made generally available to the public, including by informing the recipient of the confidential nature of the same.

11. **Miscellaneous.** This agreement will continue in full force and effect throughout Employee's tenure with any of the Fidelity Companies, regardless of any changes in Employee's responsibilities, the position Employee holds, or the particular Fidelity Company that employs Employee. Any agreement contrary to any of the provisions of this agreement or modifying this agreement in any way must be in writing and must be signed by the President or Human Resources Vice President of the Fidelity Company for which Employee works. Employee will disclose the existence and terms of this Agreement to any future employer of Employee. Employee's obligations under this Agreement shall survive the termination of Employee's employment with the Fidelity Companies. As to the provisions pertaining to Confidential Information, Employee's obligations shall continue until such time as the Confidential Information becomes known to the general public through no action on Employee's part. Any violation of this Agreement will cause irreparable damage to the Fidelity Companies or any of them. Therefore, the Fidelity Companies or any of them shall have the right to seek specific enforcement of this Agreement through equitable and injunctive relief, in addition to any other remedies available. This agreement will be for the benefit of the Fidelity Companies, its successors, and its assigns. The terms of this Agreement and any dispute out of it shall be governed by, and construed in accordance with, the laws of the state in which Employee currently is or, once Employee is no longer employed, was last, employed by Fidelity, without giving effect to such state's conflict of law principles. This Agreement is signed under seal.

**This agreement contains important information regarding the terms of Employee's employment with the Fidelity Companies. Employee and the Fidelity Companies hereby agree to adhere to it.**

DocuSigned by:

*Ernie Meads*

56228590F5F349B...

**Candidate eSignature**

11/23/2022

**eSign Date**

*Kirsten Kuykendoll*

Kirsten Kuykendoll

Head of Talent Acquisition

Updated 07/2021 Fidelity Highly Confidential Information

# EXHIBIT I

# SHUMAKER

240 South Pineapple Avenue
9th Floor
Sarasota, Florida  34236

CHARLES A. WOOD, JR.
941.364.2716
cwood@shumaker.com

o 941.366.6660
f 941.366.3999
shumaker.com

April 28, 2026

**VIA EMAIL**

Meredith A. Faro, Esq.
FMR LLC Legal Department
155 Seaport Blvd., ZW8B
Boston, MA 02210
Meredith.faro@fmr.com

Re:    Ernest Meads – Response to Cease and Desist

Dear Ms. Faro,

My firm represents Ernest Meads ("Meads") and Darwin Wealth Management ("Darwin"), and I am writing in response to your letter dated April 21, 2026 regarding Mr. Meads' obligations to Fidelity Brokerage Services LLC ("Fidelity").

As a threshold matter, Mr. Meads is in full compliance with his ongoing contractual obligations and restrictive covenants. He has acted in compliance with industry standards and has conducted himself in good faith both prior to and following his employment with Fidelity. If you have information to the contrary, please immediately provide all supporting evidence and we will resolve the issue in good faith. As written, your contention that "Fidelity has reason to believe" Mr. Meads is contacting Fidelity customers "for the purpose of soliciting their business" is unfounded and not supported with any discernible factual basis.

I have reviewed the contents of your letter with Mr. Meads and can confirm for you that Mr. Meads has not improperly retained, accessed, or used any Fidelity confidential or proprietary business documents or information in any format following his last day of employment with Fidelity. He has no documents or information to return. Moreover, Mr. Meads has not solicited any Fidelity customers. Enclosed is the fully executed affidavit of Mr. Meads affirming the same, per your request.

Importantly, this letter serves as a reminder of Fidelity's obligations under FINRA Regulatory Notice 19-10, which states that Fidelity is obligated to advise clients previously serviced by Mr. Meads of his whereabouts. Fidelity is clearly aware that Mr. Meads is affiliated with Darwin and should instruct its employees to advise former clients of the same.

Meredith A. Faro, Esq
April 28, 2026
Page 2


    Please do not hesitate to contact my office if you want to discuss this matter further. It is our hope that the explanations contained herein further satisfy Fidelity's inquiries into the circumstances regarding Mr. Meads' affiliation with Darwin and we look forward to working with you in good faith to resolve any remaining issues. In the event Fidelity intends to file any legal action whatsoever against my client, he requests an opportunity to be heard and further requests that prior and immediate notification be given to me as his counsel. Mr. Meads reserves all rights.

                              Sincerely,

                              */s/Charles A. Wood, Jr.*

                              Charles A. Wood, Jr.


Enclosure

39499690v1

# EXHIBIT J

## AFFIDAVIT OF ERNEST MEADS

Ernest Meads, being first duly sworn, states as follows:

1.     My name is Ernest Meads and I am over the age of 18. Except where otherwise indicated, the statements contained herein are based on my personal knowledge. I was employed by Fidelity Brokerage Services LLC ("Fidelity") until my employment ended effective April 5, 2026.

2.     I hereby state that I do not have in my possession, custody or control customer lists (including any Christmas or holiday card or gift mailing lists), records, electronic data, computer files, or documents pertaining to Fidelity clients or prospective clients I worked with or became aware of through my employment at Fidelity, including but not limited to names, phone numbers, addresses and/or e-mail addresses, whether in original, copied, computerized, handwritten, photographed, maintained on an iPhone or iPad or other personal device, or any other form. This includes any documents created either during or after I left my employment with Fidelity that contain information pertaining to Fidelity clients or prospective clients that I worked with or became aware of through my employment at Fidelity, including information recreated through the use of memory, or by using information in memory to recreate information from public sources. To the extent I had any such information in hard copy, I have returned the hard copy documents to Meredith Faro, along with this affidavit. To the extent I had any such information in an electronically stored format, I or my counsel has engaged with Fidelity's counsel to arrange for forensically sound preservation, prior to removal, return to Fidelity and deletion from my possession, of any such electronically stored information.

3.     I have not given any of the above documents or information or copies thereof to any other person or entity.

4.     I have deleted all connections with any Fidelity clients made during my employment at Fidelity on LinkedIn and other networking platforms, and will refrain from (a) initiating any communications with such client(s) through LinkedIn or any other similar platform's messaging function, and (b) updating my place of employment in a manner that will result in a notification being pushed out to such client(s), or which will be captured by a routine periodic push of updates to such client(s) through regular operation of LinkedIn or other platforms' systems.

Pursuant to 28 USC §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ___April  28th___ 2026            _____

                                             Ernest Meads

Sworn to and subscribed before me
this __28__ day of ___April___, 2026

_____
Notary Public

RALPH PROFETA
Notary Public - State of Florida
Commission # HH 667039
My Comm. Expires Apr 21, 2029
Bonded through National Notary Assn.